Moss v. State.

In Banc. Mar. 13, 1950.

No. 37388 (45 So. (2d) 125)

T. Fred Wicker, and B. F. Mauldin, for appellant.

**George H. Ethridge**, Acting Attorney General, for appellee.

534

**Alexander, J.**

Appellant appeals from a verdict and judgment of a conviction for rape, with a sentence to life imprisonment. The seriousness of this case and its burden of responsibility laid upon us takes into account not only the gravity of the offense as such, both against the State and the prosecutrix, but also the stake which the appellant has in an appeal from so heavy a penalty. The victim has the right to expect protection and due concern, and the defendant has equal right to expect due process. We have therefore absorbed the record testimony with deliberation and with due regard to our limited function as an appellate court.

The defendant and all of his witnesses except certain witness called to impeach prosecutrix are related either by blood or marriage. The sordid drama here unfolded began with an invitation to prosecutrix and her husband to a chicken stew at the home of one Westmoreland. There is no showing that these guests were in line for such hospitality since their acquaintance with their hosts was less than casual. But they accepted. The preparations for their escort to the promised festivities included the conditioning of the weary but time tested Ford car by filling its radiator with water, which requisite was symbolized by a conditioning of the members of her escort who sought to induce at least an artificial semblance of fellowship by an established ritual

of social drinking. Not neglected in these preliminaries was the husband of prosecutrix. Their hosts were the appellant, Stanley Wages, and Frank Westmoreland.

Upon arrival at the Westmoreland home where the chicken stew was to be laid out, there was a resumption of fellowship among the male members of the party, who, finding their supplies, consisting of only two gallon jugs of home made whiskey, inadequate, dispatched an emissary to relieve this threatened embarrassment. His mission was successful and in the ensuing resumption of social amenities the matter of the chicken stew was not brought to the attention of anyone present.

The fighting, which gifts less than prophetic could well prevision, began in fair compliance with the accepted formulas of unrestrained indulgence. It is conceded that the husband of the prosecutrix had overestimated his capacity, and the more hardy among his original escort offered to carry him to his home. Those now attending him and his wife were the defendant, Wages and one Inman. En route to his home, the husband suffered assaults by both Inman and the defendant, the former exhibiting a knife to give meaning to further threats.

Upon reaching the home of the prosecutrix, her husband was placed in bed. Defendant thereupon transferred his attention to Mrs. Owen, making proposals which took into account urges enlivened by his intoxication and encouraged by the helpless condition of her husband, whose continuing state of unconsciousness had been further guaranteed by another battery by Inman.

It was at this point that, according to the prosecutrix, the defendant compelled her to leave her room where her husband lay and to accompany him to a junk room across the hall. The time was about 8:30 or 9 P.M., and there were no lights in the latter room. The suggestion of the defendant that Inman and Wages leave the room could well be interpreted to be at war with the interests and welfare of the prosecutrix, especially since it was

followed by instant compliance. At least passive endorsement of defendant's procedure is seen in the testimony of the victim that as soon as she was released Inman made amatory advances toward her. Inman testified that he and the Wages boy went outside to locate a well whereby the leaking radiator of the car could be filled with water. This is the only intimation by anyone of the male participants that during the evening any need arose which could satisfactorily be filled with water.

The case is unique in that the criminal act is not denied by anyone present, and particularly in that Inman and Wages verified their suspicions and satisfied their curiosity by exploiting a crack or opening in the wall of the junk room, thus acquiring the status of eyewitnesses. These witnesses were unencumbered by any considerations of propriety, or by the possibility that the absence of any light in the junk room at 9 P.M. called for some resources of imagination.

In our approach to this case, we would not be seen to betray any lack of appreciation of the gravity of the charge, viewed either from the angle of the State or of appellant. Admitted facts have been rehearsed, and while we look to the case for the State to determine its sufficiency as a jury issue, no belittling of defendant's testimony is to be implied. Whether the verdict reflects any impeachment of the defense witnesses or contrasts their versions with reasonable probabilities, we need not adjudge.

So the only issue is that of consent. Prosecutrix testified that she made resistance to the limit of her resources. █ Upon this contention, it would be difficult to reconcile the authorities, especially since we have repeatedly held that a mere tactical surrender in the face of an assumed superior physical force is not enough. Where the penalty for the defendant may be supreme, so must resistance be unto the uttermost.

Yet, the testimony shows that the most effective force used by the defendant was the threat to take her life and

that of her husband, and to "tear up the house." The threats also included the summoning of Inman, who had theretofore shown himself capable by prowess and predisposition of responding upon slight occasion. We have been perplexed by the circumstance that the defendant had at immediate hand no means of carrying out this threat, save by his superior strength, and that his assurance of ready assistance by Inman may not necessarily make the danger imminent. That she did not cry out is a debit to her cause, but may well be expunged as such by the realization that her only available ally, her husband, lay unconscious and helpless at the hand of one of the band. It is a distinct credit to her cause that upon being released she fled at once, despite defendant's admonitory threats to keep silent, to the home of a neighbor to whom she made complaint and requested that the sheriff be summoned. The next morning, she also reported the affair to her husband, who, by that time, was restored to sobriety.

Concededly, we have upon appeal accepted the version of the prosecutrix since the jury must have done so, and the test before us is whether there was sufficient testimony which, if believed, could support the verdict. However, there is little conflict as to the fact of the outrage except upon the issue of consent. Upon this issue much has been written. Starting from the simple prerequisite that the act be committed against the victim's will, our statute, Code 1942, Section 2358, uses the language "without her consent." In applying this rule, involving impulses resident on the mind of the victim, it was inevitable that the issue of consent vel non should be resolved circumstantially. Initial force was therefore not enough, for submission may follow. The courts were led therefore to examine the extent and duration of such force lest it fail to persist to the end. It was logical to test this element by inquiring whether the victim failed to resist to the end. It may be that capitulation has too

often been construed as an abandonment, rather than an exhaustion, of resistance.

The quoted statute includes in its definition the administering of "any substance or liquid which shall produce such . . . weakness of body as to prevent effectual resistance." The acts and statements of the prosecutrix, together with all of the circumstances, are sufficient to support the finding by the jury that the act was perpetrated with force and without her consent.

We are not unmindful that the defendant testified otherwise, but we do not here sit as a trial jury, and it is sufficient upon this appeal to find that the jury were warranted in adjudging guilt.

Other assignments are directed to the argument of the prosecutor. ██ The bill of exceptions sets out the characterization by the State's Attorney of the defendant and Inman as "jackals" and "thugs". While we would not encourage vituperation in argument, it must be borne in mind that the prosecutor had in his hands an indictment charging the defendant with a heinous and capital crime, and it was not only his theory but his burden to establish this allegation as a fact. The act with which he was charged was to say the least bestial. Moreover, both of these targets of his vilification admitted the commission and conviction of several grave felonies, including burglary. ██ The other assignment was directed to the assertion in the argument that "the defendant and the witness, O'Neal Inman, had been going from place to place and living off the countryside." It would be enough to state that the trial judge, sustained the objection to the use of this language, and admonished the jury to disregard it. There was no motion for a mistrial. Our conclusion of no prejudicial error does not need the support of the testimony of these persons that they had been away from their homes several days practically living in the car.

Affirmed.