129 N.J. 422 (1992)
609 A.2d 1266
STATE OF NEW JERSEY IN THE INTEREST OF M.T.S.
The Supreme Court of New Jersey.
Argued January 7, 1992.
Decided July 30, 1992.
*424 Carol M. Henderson, Deputy Attorney General, argued the cause for appellant, State of New Jersey (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Jessica S. Oppenheim, Deputy Attorney General, of counsel and on the brief).
Susan Herman, Assistant Deputy Public Defender, argued the cause for respondent M.T.S. (Wilfredo Caraballo, Public Defender, attorney).
The opinion of the Court was delivered by HANDLER, J.
Under New Jersey law a person who commits an act of sexual penetration using physical force or coercion is guilty of second-degree sexual assault. The sexual assault statute does not define the words "physical force." The question posed by *425 this appeal is whether the element of "physical force" is met simply by an act of non-consensual penetration involving no more force than necessary to accomplish that result.
That issue is presented in the context of what is often referred to as "acquaintance rape." The record in the case discloses that the juvenile, a seventeen-year-old boy, engaged in consensual kissing and heavy petting with a fifteen-year-old girl and thereafter engaged in actual sexual penetration of the girl to which she had not consented. There was no evidence or suggestion that the juvenile used any unusual or extra force or threats to accomplish the act of penetration.
The trial court determined that the juvenile was delinquent for committing a sexual assault. The Appellate Division reversed the disposition of delinquency, concluding that non-consensual penetration does not constitute sexual assault unless it is accompanied by some level of force more than that necessary to accomplish the penetration. 247 N.J. Super. 254, 588 A.2d 1282 (1991). We granted the State's petition for certification. 126 N.J. 341, 598 A.2d 897 (1991).

I
The issues in this case are perplexing and controversial. We must explain the role of force in the contemporary crime of sexual assault and then define its essential features. We then must consider what evidence is probative to establish the commission of a sexual assault. The factual circumstances of this case expose the complexity and sensitivity of those issues and underscore the analytic difficulty of those seemingly-straightforward legal questions.
On Monday, May 21, 1990, fifteen-year-old C.G. was living with her mother, her three siblings, and several other people, including M.T.S. and his girlfriend. A total of ten people resided in the three-bedroom town-home at the time of the incident. M.T.S., then age seventeen, was temporarily residing at the home with the permission of the C.G.'s mother; he slept *426 downstairs on a couch. C.G. had her own room on the second floor. At approximately 11:30 p.m. on May 21, C.G. went upstairs to sleep after having watched television with her mother, M.T.S., and his girlfriend. When C.G. went to bed, she was wearing underpants, a bra, shorts, and a shirt. At trial, C.G. and M.T.S. offered very different accounts concerning the nature of their relationship and the events that occurred after C.G. had gone upstairs. The trial court did not credit fully either teenager's testimony.
C.G. stated that earlier in the day, M.T.S. had told her three or four times that he "was going to make a surprise visit up in [her] bedroom." She said that she had not taken M.T.S. seriously and considered his comments a joke because he frequently teased her. She testified that M.T.S. had attempted to kiss her on numerous other occasions and at least once had attempted to put his hands inside of her pants, but that she had rejected all of his previous advances.
C.G. testified that on May 22, at approximately 1:30 a.m., she awoke to use the bathroom. As she was getting out of bed, she said, she saw M.T.S., fully clothed, standing in her doorway. According to C.G., M.T.S. then said that "he was going to tease [her] a little bit." C.G. testified that she "didn't think anything of it"; she walked past him, used the bathroom, and then returned to bed, falling into a "heavy" sleep within fifteen minutes. The next event C.G. claimed to recall of that morning was waking up with M.T.S. on top of her, her underpants and shorts removed. She said "his penis was into [her] vagina." As soon as C.G. realized what had happened, she said, she immediately slapped M.T.S. once in the face, then "told him to get off [her], and get out." She did not scream or cry out. She testified that M.T.S. complied in less than one minute after being struck; according to C.G., "he jumped right off of [her]." She said she did not know how long M.T.S. had been inside of her before she awoke.
*427 C.G. said that after M.T.S. left the room, she "fell asleep crying" because "[she] couldn't believe that he did what he did to [her]." She explained that she did not immediately tell her mother or anyone else in the house of the events of that morning because she was "scared and in shock." According to C.G., M.T.S. engaged in intercourse with her "without [her] wanting it or telling him to come up [to her bedroom]." By her own account, C.G. was not otherwise harmed by M.T.S.
At about 7:00 a.m., C.G. went downstairs and told her mother about her encounter with M.T.S. earlier in the morning and said that they would have to "get [him] out of the house." While M.T.S. was out on an errand, C.G.'s mother gathered his clothes and put them outside in his car; when he returned, he was told that "[he] better not even get near the house." C.G. and her mother then filed a complaint with the police.
According to M.T.S., he and C.G. had been good friends for a long time, and their relationship "kept leading on to more and more." He had been living at C.G.'s home for about five days before the incident occurred; he testified that during the three days preceding the incident they had been "kissing and necking" and had discussed having sexual intercourse. The first time M.T.S. kissed C.G., he said, she "didn't want him to, but she did after that." He said C.G. repeatedly had encouraged him to "make a surprise visit up in her room."
M.T.S. testified that at exactly 1:15 a.m. on May 22, he entered C.G.'s bedroom as she was walking to the bathroom. He said C.G. soon returned from the bathroom, and the two began "kissing and all," eventually moving to the bed. Once they were in bed, he said, they undressed each other and continued to kiss and touch for about five minutes. M.T.S. and C.G. proceeded to engage in sexual intercourse. According to M.T.S., who was on top of C.G., he "stuck it in" and "did it [thrust] three times, and then the fourth time [he] stuck it in, that's when [she] pulled [him] off of her." M.T.S. said that as *428 C.G. pushed him off, she said "stop, get off," and he "hopped off right away."
According to M.T.S., after about one minute, he asked C.G. what was wrong; she replied with a back-hand to his face. He recalled asking C.G. what was wrong a second time, and her replying, "how can you take advantage of me or something like that." M.T.S. said that he proceeded to get dressed and told C.G. to calm down, but that she then told him to get away from her and began to cry. Before leaving the room, he told C.G., "I'm leaving ... I'm going with my real girlfriend, don't talk to me ... I don't want nothing to do with you or anything, stay out of my life ... don't tell anybody about this ... it would just screw everything up." He then walked downstairs and went to sleep.
On May 23, 1990, M.T.S. was charged with conduct that if engaged in by an adult would constitute second-degree sexual assault of the victim, contrary to N.J.S.A. 2C:14-2c(1). In addition, he faced unrelated charges for third-degree theft of movable property, contrary to N.J.S.A. 2C:20-3a, third-degree escape, contrary to N.J.S.A. 2C:29-5, and fourth-degree criminal trespass, contrary to N.J.S.A. 2C:18-3.
Following a two-day trial on the sexual assault charge, M.T.S. was adjudicated delinquent. After reviewing the testimony, the court concluded that the victim had consented to a session of kissing and heavy petting with M.T.S. The trial court did not find that C.G. had been sleeping at the time of penetration, but nevertheless found that she had not consented to the actual sexual act. Accordingly, the court concluded that the State had proven second-degree sexual assault beyond a reasonable doubt. On appeal, following the imposition of suspended sentences on the sexual assault and the other remaining charges, the Appellate Division determined that the absence of force beyond that involved in the act of sexual penetration precluded a finding of second-degree sexual assault. It therefore reversed *429 the juvenile's adjudication of delinquency for that offense. 247 N.J. Super. at 260-61, 588 A.2d 1282.

II
The New Jersey Code of Criminal Justice, N.J.S.A. 2C:14-2c(1), defines "sexual assault" as the commission "of sexual penetration" "with another person" with the use of "physical force or coercion."[1] An unconstrained reading of the statutory language indicates that both the act of "sexual penetration" and the use of "physical force or coercion" are separate and distinct elements of the offense. See Medical Soc. v. Department of Law & Pub. Safety, 120 N.J. 18, 26, 575 A.2d 1348 (1990) (declaring that no part of a statute should be considered meaningless or superfluous). Neither the definitions section of N.J.S.A. 2C:14-1 to -8, nor the remainder of the Code of Criminal Justice provides assistance in interpreting the words "physical force." The initial inquiry is, therefore, whether the statutory words are unambiguous on their face and can be *430 understood and applied in accordance with their plain meaning. The answer to that inquiry is revealed by the conflicting decisions of the lower courts and the arguments of the opposing parties. The trial court held that "physical force" had been established by the sexual penetration of the victim without her consent. The Appellate Division believed that the statute requires some amount of force more than that necessary to accomplish penetration.
The parties offer two alternative understandings of the concept of "physical force" as it is used in the statute. The State would read "physical force" to entail any amount of sexual touching brought about involuntarily. A showing of sexual penetration coupled with a lack of consent would satisfy the elements of the statute. The Public Defender urges an interpretation of "physical force" to mean force "used to overcome lack of consent." That definition equates force with violence and leads to the conclusion that sexual assault requires the application of some amount of force in addition to the act of penetration.
Current judicial practice suggests an understanding of "physical force" to mean "any degree of physical power or strength used against the victim, even though it entails no injury and leaves no mark." Model Jury Charges, Criminal 3 (revised Mar. 27, 1989). Resort to common experience or understanding does not yield a conclusive meaning. The dictionary provides several definitions of "force," among which are the following: (1) "power, violence, compulsion, or constraint exerted upon or against a person or thing," (2) "a general term for exercise of strength or power, esp. physical, to overcome resistance," or (3) "strength or power of any degree that is exercised without justification or contrary to law upon a person or thing." Webster's Third New International Dictionary 887 (1961).
Thus, as evidenced by the disagreements among the lower courts and the parties, and the variety of possible usages, the statutory words "physical force" do not evoke a single *431 meaning that is obvious and plain. Hence, we must pursue avenues of construction in order to ascertain the meaning of that statutory language. Those avenues are well charted. When a statute is open to conflicting interpretations, the court seeks the underlying intent of the legislature, relying on legislative history and the contemporary context of the statute. Monmouth County v. Wissell, 68 N.J. 35, 41-42, 342 A.2d 199 (1975). With respect to a law, like the sexual assault statute, that "alters or amends the previous law or creates or abolishes types of actions, it is important, in discovering the legislative intent, to ascertain the old law, the mischief and the proposed remedy." Grobart v. Grobart, 5 N.J. 161, 166, 74 A.2d 294 (1950); accord Key Agency v. Continental Casualty Co., 31 N.J. 98, 155 A.2d 547 (1959) (noting that ambiguous statutory phrases should be interpreted in light of the occasion and necessity of the law, mischief felt, and remedy in view). We also remain mindful of the basic tenet of statutory construction that penal statutes are to be strictly construed in favor of the accused. Nevertheless, the construction must conform to the intent of the Legislature. See State v. Des Marets, 92 N.J. 62, 68-70, 455 A.2d 1074 (1983); State v. Brown, 22 N.J. 405, 126 A.2d 161 (1956).
The provisions proscribing sexual offenses found in the Code of Criminal Justice, N.J.S.A. 2C:14-2c(1), became effective in 1979, and were written against almost two hundred years of rape law in New Jersey. The origin of the rape statute that the current statutory offense of sexual assault replaced can be traced to the English common law. Under the common law, rape was defined as "carnal knowledge of a woman against her will." Cynthia A. Wicktom, Note, Focusing on the Offender's Forceful Conduct: A Proposal for the Redefinition of Rape Laws, 56 Geo.Wash.L.Rev. 399, 401 (1988) (Offender's Forceful Conduct). American jurisdictions generally adopted the English view, but over time states added the requirement that the carnal knowledge have been forcible, apparently in order to prove that the act was against the victim's will. Id. at 402 *432 (citing Rollin Perkins & Ronald Boyce, Criminal Law 211 (3d ed. 1982)). As of 1796, New Jersey statutory law defined rape as "carnal knowledge of a woman, forcibly and against her will." Crimes Act of March 18, 1796 § 8, [1821] N.J.Rev.Laws (Pennington) 246. Those three elements of rape  carnal knowledge, forcibly, and against her will  remained the essential elements of the crime until 1979. Leigh Bienen, Rape III  National Developments in Rape Reform Legislation, 6 Women's Rts.L.Rep. 170, 207 (1981) (Bienen, Rape III).
Under traditional rape law, in order to prove that a rape had occurred, the state had to show both that force had been used and that the penetration had been against the woman's will. Force was identified and determined not as an independent factor but in relation to the response of the victim, which in turn implicated the victim's own state of mind. "Thus, the perpetrator's use of force became criminal only if the victim's state of mind met the statutory requirement. The perpetrator could use all the force imaginable and no crime would be committed if the state could not prove additionally that the victim did not consent." National Institute of Law Enforcement and Criminal Justice, Forcible Rape  An Analysis of Legal Issues 5 (March 1978) (Forcible Rape). Although the terms "non-consent" and "against her will" were often treated as equivalent, see, e.g., Wilson v. State, 109 A.2d 381 (Del. 1954), cert. den., 348 U.S. 983, 75 S.Ct. 574, 99 L.Ed. 765 (1955), under the traditional definition of rape, both formulations squarely placed on the victim the burden of proof and of action. Effectively, a woman who was above the age of consent had actively and affirmatively to withdraw that consent for the intercourse to be against her will. As a Delaware court stated, "If sexual intercourse is obtained by milder means, or with the consent or silent submission of the female, it cannot constitute the crime of rape." State v. Brown, 83 A. 1083, 1084 (O.T. 1912); 75 C.J.S. Rape § 11-12 (1952).
The presence or absence of consent often turned on credibility. To demonstrate that the victim had not consented to the *433 intercourse, and also that sufficient force had been used to accomplish the rape, the state had to prove that the victim had resisted. According to the oft-quoted Lord Hale, to be deemed a credible witness, a woman had to be of good fame, disclose the injury immediately, suffer signs of injury, and cry out for help. 1 Matthew Hale, History of the Pleas of the Crown 633 (1st ed. 1847). Courts and commentators historically distrusted the testimony of victims, "assuming that women lie about their lack of consent for various reasons: to blackmail men, to explain the discovery of a consensual affair, or because of psychological illness." Offender's Forceful Conduct, supra, 56 Geo. Wash.L.Rev. at 403. Evidence of resistance was viewed as a solution to the credibility problem; it was the "outward manifestation of nonconsent, [a] device for determining whether a woman actually gave consent." Note, The Resistance Standard in Rape Legislation, 18 Stan.L.Rev. 680, 689 (1966).
The resistance requirement had a profound effect on the kind of conduct that could be deemed criminal and on the type of evidence needed to establish the crime. See, e.g., State v. Brown, 127 Wis. 193, 106 N.W. 536 (1906) (overturning forcible rape conviction based on inadequate resistance by the victim); People v. Dohring, 59 N.Y. 374 (1874). Courts assumed that any woman who was forced to have intercourse against her will necessarily would resist to the extent of her ability. People v. Barnes, 42 Cal.3d 284, 228 Cal. Rptr. 228, 721 P.2d 110, 117 (1986) (observing that "[h]istorically, it was considered inconceivable that a woman who truly did not consent to sexual intercourse would not meet force with force"). In many jurisdictions the requirement was that the woman have resisted to the utmost. "Rape is not committed unless the woman oppose the man to the utmost limit of her power." People v. Carey, 223 N.Y. 519, 119 N.E. 83 (N.Y. 1918). "[A] mere tactical surrender in the face of an assumed superior physical force is not enough. Where the penalty for the defendant may be supreme, so must resistance be unto the uttermost." Moss v. State, 208 Miss. 531, 45 So.2d 125, 126 (1950). Other states *434 followed a "reasonableness" standard, while some required only sufficient resistance to make non-consent reasonably manifest. Forcible Rape, supra, at 5.
At least by the 1960s courts in New Jersey followed a standard for establishing resistance that was somewhat less drastic than the traditional rule. In State v. Harris, 70 N.J. Super. 9, 174 A.2d 645 (1961), the Appellate Division recognized that the "to the uttermost" test was obsolete. Id. at 16, 174 A.2d 645. "The fact that a victim finally submits does not necessarily imply that she consented. Submission to a compelling force, or as a result of being put in fear, is not consent." Id. at 16-17, 174 A.2d 645. Nonetheless, the "resistance" requirement remained an essential feature of New Jersey rape law. Thus, in 1965 the Appellate Division stated: "[W]e have rejected the former test that a woman must resist `to the uttermost.' We only require that she resist as much as she possibly can under the circumstances." State v. Terry, 89 N.J. Super. 445, 449, 215 A.2d 374.
The judicial interpretation of the pre-reform rape law in New Jersey, with its insistence on resistance by the victim, greatly minimized the importance of the forcible and assaultive aspect of the defendant's conduct. Rape prosecutions turned then not so much on the forcible or assaultive character of the defendant's actions as on the nature of the victim's response. Note, Recent Statutory Developments in the Definition of Forcible Rape, 61 Va.L.Rev. 1500, 1505-07 (1975) (Definition of Forcible Rape). "[I]f a woman assaulted is physically and mentally able to resist, is not terrified by threats, and is not in a place and position that resistance would have been useless, it must be shown that she did, in fact, resist the assault." State v. Terry, supra, 89 N.J. Super. at 449, 215 A.2d 374. Under the pre-reform law, the resistance offered had to be "in good faith and without pretense, with an active determination to prevent the violation of her person, and must not be merely passive and perfunctory." State v. Terry, supra, 89 N.J. Super. at 450, 215 A.2d 374. That the law put the rape victim on trial was clear.
*435 The resistance requirement had another untoward influence on traditional rape law. Resistance was necessary not only to prove non-consent but also to demonstrate that the force used by the defendant had been sufficient to overcome the victim's will. The amount of force used by the defendant was assessed in relation to the resistance of the victim. See, e.g., Tex.Penal Code Ann. § 21.02 (1974) (repealed 1983) (stating that "the amount of force necessary to negate consent is a relative matter to be judged under all the circumstances, the most important of which is the resistance of the female"). In New Jersey the amount of force necessary to establish rape was characterized as "`the degree of force sufficient to overcome any resistance that had been put up by the female.'" State v. Terry, supra, 89 N.J. Super. at 451, 215 A.2d 374 (quoting jury charge by trial court). Resistance, often demonstrated by torn clothing and blood, was a sign that the defendant had used significant force to accomplish the sexual intercourse. Thus, if the defendant forced himself on a woman, it was her responsibility to fight back, because force was measured in relation to the resistance she put forward. Only if she resisted, causing him to use more force than was necessary to achieve penetration, would his conduct be criminalized. See, e.g., Moss v. State, supra, 45 So.2d at 125. Indeed, the significance of resistance as the proxy for force is illustrated by cases in which victims were unable to resist; in such cases the force incident to penetration was deemed sufficient to establish the "force" element of the offense. E.g., Pomeroy v. State, 94 Ind. 96 (1884); State v. Atkins, 292 S.W. 422 (Mo. 1926); Lee v. State, 322 So.2d 751, 752 (Miss. 1975).
The importance of resistance as an evidentiary requirement set the law of rape apart from other common-law crimes, particularly in the eyes of those who advocated reform of rape law in the 1970s. See, e.g., Note, The Victim in a Forcible Rape Case: A Feminist View, 11 Am.Crim.L.Rev. 335, 346 (1973). However, the resistance requirement was not the only special rule applied in the rape context. A host of evidentiary *436 rules and standards of proof distinguished the legal treatment of rape from the treatment of other crimes. Many jurisdictions held that a rape conviction could not be sustained if based solely on the uncorroborated testimony of the victim. See, e.g., Allison v. United States, 409 F.2d 445, 448 (D.C. Cir.1969). Often judges added cautionary instructions to jury charges warning jurors that rape was a particularly difficult charge to prove. Courts in New Jersey allowed greater latitude in cross-examining rape victims and in delving into their backgrounds than in ordinary cases. State v. Conner, 97 N.J.L. 423, 424, 118 A. 211 (Sup.Ct. 1922). Rape victims were required to make a prompt complaint or have their allegations rejected or viewed with great skepticism. Some commentators suggested that there be mandatory psychological testing of rape victims. E.g., 3A Wigmore on Evidence § 924a (Chadbourn rev. ed. 1970).
During the 1970s feminists and others criticized the stereotype that rape victims were inherently more untrustworthy than other victims of criminal attack. See, e.g., House [of Delegates] Urges New Definition of Rape, 61 A.B.A.J. 464 (1975); Note, Toward a Consent Standard in the Law of Rape, 43 U.Chi.L.Rev. 613, 638 (1976) (Toward a Consent Standard); see also People v. Barnes, supra, 721 P.2d at 117 (discussing influence of distrust of female rape victims on legal standards). Reformers condemned such suspicion as discrimination against victims of rape. See, e.g., The Legal Bias against Rape Victims, 61 A.B.A.J. 464 (1975). They argued that "[d]istrust of the complainant's credibility [had] led to an exaggerated insistence on evidence of resistance," resulting in the victim rather than the defendant being put on trial. Toward a Consent Standard, supra 43 U.Chi.L.Rev. at 626. Reformers also challenged the assumption that a woman would seduce a man and then, in order to protect her virtue, claim to have been raped. If women are no less trustworthy than other purported victims of criminal attack, the reformers argued, then women should face no additional burdens of proving that they had not consented to or had actively resisted the assault. *437 See Linda Brookover Bourque, Defining Rape 110 (1989) (declaring objective of reform to "bring[] legal standards for rape cases in line with those used in other violent crimes by normalizing requirements for evidence").
To refute the misguided belief that rape was not real unless the victim fought back, reformers emphasized empirical research indicating that women who resisted forcible intercourse often suffered far more serious injury as a result. Menachem Amir, Patterns in Forcible Rape, 164-65, 169-171 (1971); Definition of Forcible Rape, supra, 61 Va.L.Rev. at 1506; Note, Elimination of the Resistance Requirement and Other Rape Law Reforms: The New York Experience, 47 Alb.L.Rev. 871, 872 (1983). That research discredited the assumption that resistance to the utmost or to the best of a woman's ability was the most reasonable or rational response to a rape.
The research also helped demonstrate the underlying point of the reformers that the crime of rape rested not in the overcoming of a woman's will or the insult to her chastity but in the forcible attack itself  the assault on her person. Reformers criticized the conception of rape as a distinctly sexual crime rather than a crime of violence. They emphasized that rape had its legal origins in laws designed to protect the property rights of men to their wives and daughters. Susan Brownmiller, Against Our Will: Men, Women, and Rape 377 (1975); Acquaintance Rape: The Hidden Crime 318 (Andrea Parrot & Laurie Bechhofer, eds. 1991). Although the crime had evolved into an offense against women, reformers argued that vestiges of the old law remained, particularly in the understanding of rape as a crime against the purity or chastity of a woman. Definition of Forcible Rape, supra, 61 Va.L.Rev. at 1506. The burden of protecting that chastity fell on the woman, with the state offering its protection only after the woman demonstrated that she had resisted sufficiently.
That rape under the traditional approach constituted a sexual rather than an assaultive crime is underscored by the spousal *438 exemption. According to the traditional reasoning, a man could not rape his wife because consent to sexual intercourse was implied by the marriage contract. See, e.g., State v. Smith, 85 N.J. 193, 426 A.2d 38 (1981); see also Bienen, Rape III, supra, 6 Women's Rts.L.Rep. at 184, 207 (noting that common-law principles excluded spouses from prosecution in New Jersey as in most other jurisdictions). Therefore, sexual intercourse between spouses was lawful regardless of the force or violence used to accomplish it. Offender's Forceful Conduct, supra, 58 Geo.Wash.L.Rev. at 402; Note, To Have and to Hold: The Marital Rape Exemption and the Fourteenth Amendment, 99 Harv.L.Rev. 1255, 1258-60 (1986); see also Hale, supra, at 629 (noting that "a `ravished' woman could `redeem' the convicted offender and save him from execution by marrying him").
Critics of rape law agreed that the focus of the crime should be shifted from the victim's behavior to the defendant's conduct, and particularly to its forceful and assaultive, rather than sexual, character. Reformers also shared the goals of facilitating rape prosecutions and of sparing victims much of the degradation involved in bringing and trying a charge of rape. There were, however, differences over the best way to redefine the crime. Some reformers advocated a standard that defined rape as unconsented-to sexual intercourse, Towards a Consent Standard, supra, 43 U.Chi.L.Rev. 613; others urged the elimination of any reference to consent from the definition of rape, Offender's Forceful Conduct, supra, 56 Geo.Wash.L.Rev. at 401. Nonetheless, all proponents of reform shared a central premise: that the burden of showing non-consent should not fall on the victim of the crime. In dealing with the problem of consent the reform goal was not so much to purge the entire concept of consent from the law as to eliminate the burden that had been placed on victims to prove they had not consented. Ibid.
Similarly, with regard to force, rape law reform sought to give independent significance to the forceful or assaultive conduct of the defendant and to avoid a definition of force that *439 depended on the reaction of the victim. Traditional interpretations of force were strongly criticized for failing to acknowledge that force may be understood simply as the invasion of "bodily integrity." Susan Estrich, Rape, 95 Yale L.J. 1087, 1105, (1986). In urging that the "resistance" requirement be abandoned, reformers sought to break the connection between force and resistance.

III
The history of traditional rape law sheds clearer light on the factors that became most influential in the enactment of current law dealing with sexual offenses. The circumstances surrounding the actual passage of the current law reveal that it was conceived as a reform measure reconstituting the law to address a widely-sensed evil and to effectuate an important public policy. Those circumstances are highly relevant in understanding legislative intent and in determining the objectives of the current law.
In October 1971, the New Jersey Criminal Law Revision Commission promulgated a Final Report and Commentary on its proposed New Jersey Penal Code. New Jersey Criminal Law Revision Commission, The New Jersey Penal Code, Vol. I: Report and Penal Code (1971). The proposed Code substantially followed the American Law Institute's Model Penal Code (MPC) with respect to sexual offenses. See M.P.C. §§ 213.1 to 213.4. The proposed provisions did not present a break from traditional rape law. They would have established two principal sexual offenses: aggravated rape, a first-degree or second-degree crime involving egregious circumstances; and rape, a crime of the third-degree. 1971 Penal Code, § 2C:14-1(a)(1). Rape was defined as sexual intercourse with a female to which she was compelled to submit by any threat that would prevent resistance by a woman of ordinary resolution. Id. at § 14-1(b)(1). The comments to the MPC, on which the proposed Code was based, state that "[c]ompulsion plainly implies non-consent," *440 and that the words "compels to submit" require more than "a token initial resistance." A.L.I., MPC, § 213.1, comments at 306 (revised commentary 1980).
The Legislature did not endorse the Model Penal Code approach to rape. Rather, it passed a fundamentally different proposal in 1978 when it adopted the Code of Criminal Justice. L. 1978, c. 95 § 2C:14-1 to -7; N.J.S.A. 2C:14-1 to -7. The new statutory provisions covering rape were formulated by a coalition of feminist groups assisted by the National Organization of Women (NOW) National Task Force on Rape. Bienen, Rape III, supra, 6 Women's Rts.L.Rep. at 207. Both houses of the Legislature adopted the NOW bill, as it was called, without major changes and Governor Byrne signed it into law on August 10, 1978. Id. at 207-08. The NOW bill had been modeled after the 1976 Philadelphia Center for Rape Concern Model Sex Offense Statute. Leigh Bienen, Rape II, 3 Women's Rts.L.Rep. 90 (1977). The Model Sex Offense Statute in turn had been based on selected provisions of the Michigan Criminal Sexual Conduct Statute, Mich. Stat. Ann. § 28.788(4)(b) (Callaghan 1990), [M.C.L.A. § 750.520d] and on the reform statutes in New Mexico, Minnesota, and Wisconsin. Bienen, Rape III, supra, 6 Women's Rts.L.Rep. at 207. The stated intent of the drafters of the Philadelphia Center's Model Statute had been to remove all features found to be contrary to the interests of rape victims. John M. Cannel, New Jersey Criminal Code Annotated 279 (1991). According to its proponents the statute would "`normalize the law. We are no longer saying rape victims are likely to lie. What we are saying is that rape is just like other violent crimes.'" Stuart Marques, Women's Coalition Lauds Trenton Panel: Tough Rape Law Revisions Advance, Newark Star Ledger, (May 10, 1978) at 1 (quoting Roberta Kaufman, New Jersey Coalition Against Rape).
Since the 1978 reform, the Code has referred to the crime that was once known as "rape" as "sexual assault." The crime now requires "penetration," not "sexual intercourse." It requires "force" or "coercion," not "submission" or "resistance." *441 It makes no reference to the victim's state of mind or attitude, or conduct in response to the assault. It eliminates the spousal exception based on implied consent. It emphasizes the assaultive character of the offense by defining sexual penetration to encompass a wide range of sexual contacts, going well beyond traditional "carnal knowledge."[2] Consistent with the assaultive character, as opposed to the traditional sexual character, of the offense, the statute also renders the crime gender-neutral: both males and females can be actors or victims.
The reform statute defines sexual assault as penetration accomplished by the use of "physical force" or "coercion," but it does not define either "physical force" or "coercion" or enumerate examples of evidence that would establish those elements. Some reformers had argued that defining "physical force" too specifically in the sexual offense statute might have the effect of limiting force to the enumerated examples. Bienen, Rape III, supra, 6 Women's Rts.L.Rep. at 181. The task of defining "physical force" therefore was left to the courts.
That definitional task runs the risk of undermining the basic legislative intent to reformulate rape law. See Susan Estrich, Real Rape 60 (1987) (noting that under many modern formulations of rape "[t]he prohibition of force or `forcible compulsion' ends up being defined in terms of a woman's resistance"). That risk was encountered by the Michigan Supreme Court in People v. Patterson, 428 Mich. 502, 410 N.W.2d 733 (1987). That court considered the sufficiency of the evidence of force or coercion in the prosecution of a sexual contact charge against a defendant who had placed his hands on the genital area of a seventeen-year-old girl while she was sleeping. A majority of *442 the court concluded that the defendant had not used force as required by the statute because there was "no evidence of physical overpowering ... [and] there was no submission." Id. 410 N.W.2d at 740. Justice Boyle, in dissent, soundly criticized the majority's position as a distortion of the legislature's intent to protect the sexual privacy of persons from the use of force, coercion, or other undue advantage. Concluding that the statute did not require a showing of any extra force, Justice Boyle pointed out that in "defin[ing] force by measuring the degree of resistance by the victim," the majority had effectively "reintroduc[ed] the resistance requirement, when the proper focus ought to be on whether the contact was unpermitted." Id. at 747-49.
Unlike the Michigan statute interpreted in Patterson, the New Jersey Code of Criminal Justice does not refer to force in relation to "overcoming the will" of the victim, or to the "physical overpowering" of the victim, or the "submission" of the victim. It does not require the demonstrated non-consent of the victim. As we have noted, in reforming the rape laws, the Legislature placed primary emphasis on the assaultive nature of the crime, altering its constituent elements so that they focus exclusively on the forceful or assaultive conduct of the defendant.
The Legislature's concept of sexual assault and the role of force was significantly colored by its understanding of the law of assault and battery. As a general matter, criminal battery is defined as "the unlawful application of force to the person of another." 2 Wayne LaFave & Austin Scott, Criminal Law, § 7.15 at 301 (1986). The application of force is criminal when it results in either (a) a physical injury or (b) an offensive touching. Id. at 301-02. Any "unauthorized touching of another [is] a battery." Perna v. Pirozzi, 92 N.J. 446, 462, 457 A.2d 431 (1983). Thus, by eliminating all references to the victim's state of mind and conduct, and by broadening the definition of penetration to cover not only sexual intercourse *443 between a man and a woman but a range of acts that invade another's body or compel intimate contact, the Legislature emphasized the affinity between sexual assault and other forms of assault and battery.
The intent of the Legislature to redefine rape consistent with the law of assault and battery is further evidenced by the legislative treatment of other sexual crimes less serious than and derivative of traditional rape. The Code redefined the offense of criminal sexual contact to emphasize the involuntary and personally-offensive nature of the touching. N.J.S.A. 2C:14-1(d). Sexual contact is criminal under the same circumstances that render an act of sexual penetration a sexual assault, namely, when "physical force" or "coercion" demonstrates that it is unauthorized and offensive. N.J.S.A. 2C:14-3(b). Thus, just as any unauthorized touching is a crime under traditional laws of assault and battery, so is any unauthorized sexual contact a crime under the reformed law of criminal sexual contact, and so is any unauthorized sexual penetration a crime under the reformed law of sexual assault.
The understanding of sexual assault as a criminal battery, albeit one with especially serious consequences, follows necessarily from the Legislature's decision to eliminate non-consent and resistance from the substantive definition of the offense. Under the new law, the victim no longer is required to resist and therefore need not have said or done anything in order for the sexual penetration to be unlawful. The alleged victim is not put on trial, and his or her responsive or defensive behavior is rendered immaterial. We are thus satisfied that an interpretation of the statutory crime of sexual assault to require physical force in addition to that entailed in an act of involuntary or unwanted sexual penetration would be fundamentally inconsistent with the legislative purpose to eliminate any consideration of whether the victim resisted or expressed non-consent.
*444 We note that the contrary interpretation of force  that the element of force need be extrinsic to the sexual act  would not only reintroduce a resistance requirement into the sexual assault law, but also would immunize many acts of criminal sexual contact short of penetration. The characteristics that make a sexual contact unlawful are the same as those that make a sexual penetration unlawful. An actor is guilty of criminal sexual contact if he or she commits an act of sexual contact with another using "physical force" or "coercion." N.J.S.A. 2C:14-3(b). That the Legislature would have wanted to decriminalize unauthorized sexual intrusions on the bodily integrity of a victim by requiring a showing of force in addition to that entailed in the sexual contact itself is hardly possible.
Because the statute eschews any reference to the victim's will or resistance, the standard defining the role of force in sexual penetration must prevent the possibility that the establishment of the crime will turn on the alleged victim's state of mind or responsive behavior. We conclude, therefore, that any act of sexual penetration engaged in by the defendant without the affirmative and freely-given permission of the victim to the specific act of penetration constitutes the offense of sexual assault. Therefore, physical force in excess of that inherent in the act of sexual penetration is not required for such penetration to be unlawful. The definition of "physical force" is satisfied under N.J.S.A. 2C:14-2c(1) if the defendant applies any amount of force against another person in the absence of what a reasonable person would believe to be affirmative and freely-given permission to the act of sexual penetration.
Under the reformed statute, permission to engage in sexual penetration must be affirmative and it must be given freely, but that permission may be inferred either from acts or statements reasonably viewed in light of the surrounding circumstances. See Ill. Rev. Stat. ch. 38, para. 12-17 (1984) (defining consent as "freely given agreement"); see also, People v. *445 Patterson, supra, 410 N.W.2d at 749 (Boyle, J., dissenting) (reasoning that "force" may include "a sexual touching brought about involuntarily," and may consist of "a contact which occurs before consent can be given or refused"); cf. N.J.S.A. 2C:2-10(c)(3) (indicating that "consent" does not constitute a defense sufficient to negate an element of a crime if consent was induced or accomplished by force or coercion). Persons need not, of course, expressly announce their consent to engage in intercourse for there to be affirmative permission. Permission to engage in an act of sexual penetration can be and indeed often is indicated through physical actions rather than words. Permission is demonstrated when the evidence, in whatever form, is sufficient to demonstrate that a reasonable person would have believed that the alleged victim had affirmatively and freely given authorization to the act.
Our understanding of the meaning and application of "physical force" under the sexual assault statute indicates that the term's inclusion was neither inadvertent nor redundant. The term "physical force," like its companion term "coercion," acts to qualify the nature and character of the "sexual penetration." Sexual penetration accomplished through the use of force is unauthorized sexual penetration. That functional understanding of "physical force" encompasses the notion of "unpermitted touching" derived from the Legislature's decision to redefine rape as a sexual assault. As already noted, under assault and battery doctrine, any amount of force that results in either physical injury or offensive touching is sufficient to establish a battery. Hence, as a description of the method of achieving "sexual penetration," the term "physical force" serves to define and explain the acts that are offensive, unauthorized, and unlawful.
That understanding of the crime of sexual assault fully comports with the public policy sought to be effectuated by the Legislature. In redefining rape law as sexual assault, the Legislature adopted the concept of sexual assault as a crime against the bodily integrity of the victim. Although it is *446 possible to imagine a set of rules in which persons must demonstrate affirmatively that sexual contact is unwanted or not permitted, such a regime would be inconsistent with modern principles of personal autonomy. The Legislature recast the law of rape as sexual assault to bring that area of law in line with the expectation of privacy and bodily control that long has characterized most of our private and public law. See Hennessey v. Coastal Eagle Paint Oil Co., 129 N.J. 81, 94-96, 609 A.2d 11 (1992) (recognizing importance of constitutional and common-law protection of personal privacy); id. at 106, 609 A.2d 11 (Pollock, J., concurring) (emphasizing that common-law right of privacy protects individual self-determination and autonomy). In interpreting "physical force" to include any touching that occurs without permission we seek to respect that goal.
Today the law of sexual assault is indispensable to the system of legal rules that assures each of us the right to decide who may touch our bodies, when, and under what circumstances. The decision to engage in sexual relations with another person is one of the most private and intimate decisions a person can make. Each person has the right not only to decide whether to engage in sexual contact with another, but also to control the circumstances and character of that contact. No one, neither a spouse, nor a friend, nor an acquaintance, nor a stranger, has the right or the privilege to force sexual contact. See Definition of Forcible Rape, supra, 61 Va.L.Rev. at 1529 (arguing that "forcible rape is viewed as a heinous crime primarily because it is a violent assault on a person's bodily security, particularly degrading because that person is forced to submit to an act of the most intimate nature").
We emphasize as well that what is now referred to as "acquaintance rape" is not a new phenomenon. Nor was it a "futuristic" concept in 1978 when the sexual assault law was enacted. Current concern over the prevalence of forced sexual intercourse between persons who know one another reflects both greater awareness of the extent of such behavior and a growing appreciation of its gravity. Notwithstanding the *447 stereotype of rape as a violent attack by a stranger, the vast majority of sexual assaults are perpetrated by someone known to the victim. Acquaintance Rape, supra, at 10. One respected study indicates that more than half of all rapes are committed by male relatives, current or former husbands, boyfriends or lovers. Diana Russell, The Prevalence and Incidence of Forcible Rape and Attempted Rape of Females, 7 Victimology 81 (1982). Similarly, contrary to common myths, perpetrators generally do not use guns or knives and victims generally do not suffer external bruises or cuts. Acquaintance Rape, supra, at 10. Although this more realistic and accurate view of rape only recently has achieved widespread public circulation, it was a central concern of the proponents of reform in the 1970s. Id. at 18.
The insight into rape as an assaultive crime is consistent with our evolving understanding of the wrong inherent in forced sexual intimacy. It is one that was appreciated by the Legislature when it reformed the rape laws, reflecting an emerging awareness that the definition of rape should correspond fully with the experiences and perspectives of rape victims. Although reformers focused primarily on the problems associated with convicting defendants accused of violent rape, the recognition that forced sexual intercourse often takes place between persons who know each other and often involves little or no violence comports with the understanding of the sexual assault law that was embraced by the Legislature. Any other interpretation of the law, particularly one that defined force in relation to the resistance or protest of the victim, would directly undermine the goals sought to be achieved by its reform.

IV
In a case such as this one, in which the State does not allege violence or force extrinsic to the act of penetration, the factfinder must decide whether the defendant's act of penetration was undertaken in circumstances that led the defendant reasonably *448 to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration. Such permission can be indicated either through words or through actions that, when viewed in the light of all the surrounding circumstances, would demonstrate to a reasonable person affirmative and freely-given authorization for the specific act of sexual penetration.
In applying that standard to the facts in these cases, the focus of attention must be on the nature of the defendant's actions. The role of the factfinder is not to decide whether reasonable people may engage in acts of penetration without the permission of others. The Legislature answered that question when it enacted the reformed sexual assault statute: reasonable people do not engage in acts of penetration without permission, and it is unlawful to do so. The role of the factfinder is to decide not whether engaging in an act of penetration without permission of another person is reasonable, but only whether the defendant's belief that the alleged victim had freely given affirmative permission was reasonable.
In these cases neither the alleged victim's subjective state of mind nor the reasonableness of the alleged victim's actions can be deemed relevant to the offense. The alleged victim may be questioned about what he or she did or said only to determine whether the defendant was reasonable in believing that affirmative permission had been freely given. To repeat, the law places no burden on the alleged victim to have expressed non-consent or to have denied permission, and no inquiry is made into what he or she thought or desired or why he or she did not resist or protest.
In short, in order to convict under the sexual assault statute in cases such as these, the State must prove beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely-given permission of the alleged victim. As we have indicated, such proof can be based on evidence of conduct or words in light of *449 surrounding circumstances and must demonstrate beyond a reasonable doubt that a reasonable person would not have believed that there was affirmative and freely-given permission. If there is evidence to suggest that the defendant reasonably believed that such permission had been given, the State must demonstrate either that defendant did not actually believe that affirmative permission had been freely-given or that such a belief was unreasonable under all of the circumstances. Thus, the State bears the burden of proof throughout the case.
In the context of a sexual penetration not involving unusual or added "physical force," the inclusion of "permission" as an aspect of "physical force" effectively subsumes and obviates any defense based on consent. See N.J.S.A. 2C:2-10c(3). The definition of "permission" serves to define the "consent" that otherwise might allow a defendant to avoid criminal liability. Because "physical force" as an element of sexual assault in this context requires the absence of affirmative and freely-given permission, the "consent" necessary to negate such "physical force" under a defense based on consent would require the presence of such affirmative and freely-given permission. Any lesser form of consent would render the sexual penetration unlawful and cannot constitute a defense.
In this case, the Appellate Division concluded that non-consensual penetration accomplished with no additional physical force or coercion is not criminalized under the sexual assault statute. 247 N.J. Super. at 260, 588 A.2d 1282. It acknowledged that its conclusion was "anomalous" because it recognized that "a woman has every right to end [physically intimate] activity without sexual penetration." Ibid. Thus, it added to its holding that "[e]ven the force of penetration might... be sufficient if it is shown to be employed to overcome the victim's unequivocal expressed desire to limit the encounter." Ibid.
The Appellate Division was correct in recognizing that a woman's right to end intimate activity without penetration is a *450 protectable right the violation of which can be a criminal offense. However, it misperceived the purpose of the statute in believing that the only way that right can be protected is by the woman's unequivocally-expressed desire to end the activity. The effect of that requirement would be to import into the sexual assault statute the notion that an assault occurs only if the victim's will is overcome, and thus to reintroduce the requirement of non-consent and victim-resistance as a constituent material element of the crime. Under the reformed statute, a person's failure to protest or resist cannot be considered or used as justification for bodily invasion.
We acknowledge that cases such as this are inherently fact sensitive and depend on the reasoned judgment and common sense of judges and juries. The trial court concluded that the victim had not expressed consent to the act of intercourse, either through her words or actions. We conclude that the record provides reasonable support for the trial court's disposition.
Accordingly, we reverse the judgment of the Appellate Division and reinstate the disposition of juvenile delinquency for the commission of second-degree sexual assault.
For reversal and reinstatement  Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN  7.
Opposed  None.
NOTES
[1] The sexual assault statute, N.J.S.A.: 2C:14-2c(1), reads as follows:

c. An actor is guilty of sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:
(1) The actor uses physical force or coercion, but the victim does not sustain severe personal injury;
(2) The victim is one whom the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated;
(3) The victim is on probation or parole, or is detained in a hospital, prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional or occupational status;
(4) The victim is at least 16 but less than 18 years old and:
(a) The actor is related to the victim by blood or affinity to the third degree; or
(b) The actor has supervisory or disciplinary power over the victim; or
(c) The actor is a foster parent, a guardian, or stands in loco parentis within the household;
(5) The victim is at least 13 but less than 16 years old and the actor is at least 4 years older than the victim.
Sexual assault is a crime of the second degree.
[2] The reform replaced the concept of carnal abuse, which was limited to vaginal intercourse, with specific kinds of sexual acts contained in a broad definition of penetration:

Sexual penetration means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction. [N.J.S.A. 2C:14-1.]