SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**C.R. v. M.T.** (A-58-19) (083760)

**Argued November 30, 2020 -- Decided September 28, 2021**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this case, the Court considers for the first time the standard that should apply in determining whether an alleged sexual assault victim was too intoxicated to give consent under the Sexual Assault Survivor Protection Act of 2015 (SASPA).

In June 2018, plaintiff "Clara" and defendant "Martin" engaged in sexual activity after a night of drinking. Plaintiff alleges she was too intoxicated to give consent, but defendant claims that the entire encounter was consensual. Plaintiff filed for a temporary restraining order pursuant to SASPA, which requires consideration of at least two factors, commonly referred to as the two "prongs" of SASPA: "(1) the occurrence of one or more acts of nonconsensual sexual contact . . . against the alleged victim; and (2) the possibility of future risk to the safety or well-being of the alleged victim." N.J.S.A. 2C:14-16(a).

After conducting a hearing, the trial court found both parties' accounts to be "equally plausible." Applying the preponderance of the evidence standard, the court concluded that Clara's extreme voluntary intoxication rendered her "temporarily incapable of understanding the nature of her conduct" and that she had therefore been subjected to nonconsensual sexual contact within the meaning of SASPA's first prong. Turning to the second SASPA prong, the judge noted the lack of evidence that Martin sought to contact Clara after their encounter. Nonetheless, recognizing that SASPA was intended to provide protection to victims of nonconsensual sexual contact, as well as the possibility that Martin "may now harbor a grudge against [Clara] which would probably not have occurred but for these proceedings," the court concluded that "it is more likely than not that a final restraining order is appropriate."

The Appellate Division reversed and remanded, holding that the proper standard to assess whether plaintiff was incapable of consent due to intoxication was the prostration of faculties standard. 461 N.J. Super. 341, 353 (App. Div. 2019). The Court granted certification. 241 N.J. 329 (2020).

**HELD:** The appropriate standard to determine whether sexual activity was consensual under SASPA is not the prostration of faculties standard, which focuses on the mental state of the defendant, but rather the standard articulated in State in Interest of M.T.S.,

1

129 N.J. 422 (1992), which is applied from the perspective of the alleged victim. The M.T.S. standard requires a showing that sexual activity occurred without the alleged victim's freely and affirmatively given permission to engage in that activity. The standard for consent for an alleged victim in a SASPA case should be no different than the standard for consent for an alleged victim in a criminal sexual assault case. The Court reverses and remands this matter to the trial court for assessment under the standard articulated in M.T.S.

1. SASPA is located within the Criminal Code in Chapter 14, which governs sexual offenses, but SASPA is not a penal statute. Rather, SASPA offers relief in the form of a civil protective order to alleged victims of nonconsensual sexual contact. A person may apply for, and the court may issue, a protective order under SASPA "regardless of whether criminal charges based on the incident were filed and regardless of the disposition of any such charges." N.J.S.A. 2C:14-14(c)(1). A Superior Court judge may grant a temporary protective order and "any relief necessary to protect the safety and well-being of an alleged victim." Id. at -15(a). Upon an application for a final protective order, the Superior Court must hold a hearing and the applicant must prove the allegations by a preponderance of the evidence. SASPA provides that the court shall consider but not be limited to the factors commonly referred to as the two "prongs" of SASPA set forth in N.J.S.A. 2C:14-16(a). (pp. 16-18)

2. SASPA does not define "consent" or establish guideposts for determining when sexual activity is nonconsensual. In 1992, however, the Court issued M.T.S., a landmark decision that established affirmative consent as the standard in sexual assault cases. See 129 N.J. 422. In M.T.S., the Court conducted an extensive examination of the history of rape laws throughout the country, particularly the stigma that has historically been attached to alleged victims. The Court detailed the history of mistrust of victim testimony and concluded that the showing of resistance required in many jurisdictions had the effect of putting the rape victim on trial. To eliminate the burden victims bore of showing non-consent, the Court determined that the better standard was to look at whether permission to engage in sexual activity was freely and affirmatively given. The Court clarified that "permission may be inferred either from acts or statements reasonably viewed in light of the surrounding circumstances." Id. at 444. (pp. 19-21)

3. In 2020, the Legislature amended the criminal sexual assault statute so that all references to "physical force" were removed and replaced with references to the standard adopted in M.T.S. See N.J.S.A. 2C:14-2. The Legislature acknowledged that since the M.T.S. decision, courts that consider sexual assault cases need to use both the statute and the court decision to determine the elements necessary for conviction. Although the Legislature in enacting SASPA in 2015 made no mention of how courts were to go about determining whether the sexual activity in question was nonconsensual, the Legislature was certainly aware of the M.T.S. holding and that courts had been applying the decision's affirmative consent standard in the decades since that case. (pp. 21-23)

4. The Court reviews the prostration of faculties standard, which it has long applied to establish whether a criminal defendant was too intoxicated to form the requisite mens rea for a charged offense. Application of that standard here would impose on an alleged victim the high burden of establishing that she was too intoxicated to consent. But under New Jersey statutes and case law, the standard for consent applicable to an alleged victim and the standard for an intoxication defense applicable to an accused criminal defendant are different. A holding that alleged victims of sexual assault seeking a protective order should be held to the same standard as criminal defendants would set the Court's law back decades to a time when alleged victims were the ones essentially put on trial, and would be inconsistent with the standard set forth in M.T.S. The Court finds it unlikely that the Legislature intended to incorporate the term "mentally incapacitated" from the criminal sexual assault statute into SASPA, given that it made no attempt to do so in drafting the plain language of the statute and its awareness of the M.T.S. standard. The language of N.J.S.A. 2C:14-16(b), further, is consistent with applying the standard set forth in M.T.S. and undermines any notion that the Legislature intended alleged victims of sexual assault to be put on trial with the prostration of faculties standard. (pp. 23-26)

5. The prostration of faculties standard is and has only ever been applied to alleged criminals seeking to evade culpability. That concept has no place in the Court's jurisprudence as applied to alleged victims of sexual assault seeking a protective order. The Court remands the matter for reconsideration of the final restraining order and whether the sexual activity was nonconsensual utilizing the M.T.S. affirmative consent standard. (p. 27)

6. The Court's remand encompasses a reconsideration of the second prong of SASPA -- whether there is a "possibility of future risk to the safety or well-being of the alleged victim." N.J.S.A. 2C:14-16(a)(2). The trial court first noted that there was no evidence that defendant sought to contact plaintiff after the incident but then quickly found that prong two was satisfied because defendant was "subjected to legal fees and may now harbor a grudge against the plaintiff." It cannot be that simply filing for a protective order is sufficient to satisfy prong two or it would be met in every single SASPA case. That could not have been the Legislature's intention. The trial court's factual findings appear to counter plaintiff's establishing prong two. The Court remands so that the trial court may expand upon its abbreviated discussion of prong two and make additional findings of fact that support a determination that the prong has been satisfied, or not, in deciding whether to issue the final restraining order. (pp. 27-28)

**REVERSED and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.**

3

C.R.,

Plaintiff-Appellant,

v.

M.T.,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
461 N.J. Super. 341 (App. Div. 2019).

| Argued | Decided |
| --- | --- |
| November 30, 2020 | September 28, 2021 |

Andrew Vazquez-Schroedinger argued the cause for
appellant (South Jersey Legal Services; attorneys,
Andrew Vazquez-Schroedinger, Kenneth M. Goldman,
and Douglas E. Gershuny, on the briefs).

Nancy Kennedy Brent argued the cause for respondent
(The Kennedy Brent Law Firm, attorneys; Nancy
Kennedy Brent, on the brief).

Mary M. McManus-Smith argued the cause for amicus
curiae (Legal Services of New Jersey, attorneys; Mary M.
McManus-Smith, and Melville D. Miller, Jr., on the
briefs).

CJ Griffin argued the cause for amici curiae New Jersey
Coalition Against Sexual Assault and Partners for

Women and Justice (Pashman Stein Walder Hayden; attorneys, CJ Griffin, of counsel, and on the brief).

Victoria L. Chase submitted a brief on behalf of amici curiae Rutgers School of Law (Camden) Domestic Violence Clinic and Domestic Violence Project (Rutgers Domestic Violence Clinic, attorneys; Victoria L. Chase, and Denise M. Higgins, on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this case, we consider for the first time the standards required for entry of an order of protection to a sexual assault victim under the Sexual Assault Survivor Protection Act of 2015 (SASPA). Specifically, we are asked to resolve the standard that should apply in determining whether an alleged sexual assault victim was too intoxicated to give consent. After a night of drinking, plaintiff and defendant engaged in sexual activity. Plaintiff alleges that it was nonconsensual and that she was too intoxicated to give consent. Defendant claims that the entire encounter was consensual. Plaintiff filed for a temporary restraining order pursuant to SASPA. The trial court granted the restraining order and found that plaintiff was too drunk to consent.

On appeal, the Appellate Division reversed and remanded the matter to the trial court and directed the trial court to conduct additional fact-finding regarding plaintiff's level of intoxication that night. C.R. v. M.T., 461 N.J. Super. 341, 353 (App. Div. 2019). Specifically, the Appellate Division held

2

that the proper standard by which the trial court must assess whether the alleged victim was too intoxicated to give consent is the "prostration of faculties" standard, id. at 350-51, a standard utilized only when criminal defendants assert intoxication as a defense to negate the requisite mens rea to commit a crime. The Appellate Division remanded the matter to the trial court for the application of the prostration of faculties standard. Id. at 353.

We granted plaintiff's petition for certification. We hold that the appropriate standard to determine whether sexual activity was consensual under SASPA is not the prostration of faculties standard, which focuses on the mental state of the defendant, but rather the standard articulated in a criminal case almost three decades ago in State in Interest of M.T.S., 129 N.J. 422 (1992), which is applied from the perspective of the alleged victim. The M.T.S. standard requires a showing that sexual activity occurred without the alleged victim's freely and affirmatively given permission to engage in that activity. The standard for consent for an alleged victim in a SASPA case should be no different than the standard for consent for an alleged victim in a criminal sexual assault case. Because the trial court applied a different standard, we reverse and remand this matter for assessment under the standard articulated in M.T.S.

I.

We rely on the testimony from the family court hearing for the following factual summary.

On the evening of June 26, 2018, twenty-one-year-old Clara went to her close friend Sylvia's house, with plans to go out to a bar together.[1] There, they drank Smirnoff Ice -- Clara consumed two shots and Sylvia took four shots -- before Sylvia's roommate drove them to Cinder Bar. At the bar, Clara and Sylvia consumed more alcohol, until the bartender refused to serve them because Sylvia was being "really loud" and "really inappropriate for that setting." Together on speaker phone, Sylvia and Clara called Sylvia's cousin Martin, the defendant, and asked if he would join them there. Martin declined, stating he had to work early the next morning and that they should "go home" because they were drunk.

Sylvia's roommate picked up Clara and Sylvia and took them to another bar, where Clara had two more drinks. Around 11:00 p.m., the bartender -- who knew Martin -- texted him that "there's a girl here saying that [she is your] cousin [with] a friend, and they seem to be all fired up." To Sylvia and Clara's surprise, Martin then arrived at the bar and said "[c]ome on, we're

---

[1] Pseudonyms are used to protect the identities of the parties and witnesses in this matter.

leaving." Clara responded that she had not finished her drink or paid yet, and Martin said to "chug [the drink] and not to worry about it." Clara complied and left along with Sylvia in Martin's car.

Sylvia asked Martin to take them home, but Martin said "[n]o. We're just going to my house. I have work in the morning and [your roommate] can pick you up from my house." When they arrived at Martin's house, Martin put Sylvia to bed in his guest room with a bucket next to the bed because according to Martin, she was "really intoxicated." Sylvia, however, wanted to stay up and drink some more, so she came out of the room a few times, and Martin returned her to the room each time. Meanwhile, Clara went to Martin's fridge and had three more drinks. Martin testified that he "had a couple with them because [he] was up," but stated that he was not drunk at the time.

At that point, Clara and Martin's versions of events diverge.

## A.

### Clara's Testimony

According to Clara, after Martin put Sylvia to bed, she remembers "kind of walking around in the main area for what felt like hours" as Sylvia kept coming back out of the bedroom and Martin kept putting her back to bed. Clara also recalled finding out that a close friend's brother had cancer and going outside to call and console him. She said that her friend was mad at her

5

for being so drunk on the phone and Sylvia and Martin came outside to bring her back into the house. Clara stated that after Sylvia went back to bed, Martin put Clara over his shoulder and carried her into the garage.

Clara testified that she made several attempts to leave the garage until Martin stood in front of the door. She said she knew she "couldn't get out this time" because he was "blocking the doorway" and was "at least double [Clara's] size." Martin is over six feet tall and weighs roughly 280 pounds. Clara said that Martin told her multiple times to take off her pants, and although she did not comply at first, she eventually did, feeling "terrified because [she] didn't see . . . another way out." Clara testified that she heard him repeatedly say "I wanna eat the box." She remembered seeing her underwear around Martin's neck, and despite her efforts, he refused to give it back to her. Clara explained that Martin "was intimidating" and that she "was terrified." The next thing she recalled was "being on [her] forearms and [her] shins and [Martin's] head was behind [her and] between [her legs]." She "felt frozen" and told him "I don't want this. I don't want this. I don't want this," but Martin did not listen to her. Clara stated that Martin performed both oral sex and vaginal intercourse on her. Clara testified multiple times that she was heavily intoxicated during the encounter.

6

Clara said that when she realized that Martin had stopped, she left to go to the room where Sylvia was sleeping. She said that she laid down next to Sylvia and pretended to sleep. She remembered Martin coming into the room and looking over them before leaving.

Clara disclosed the assault to a friend, who took her to the police station to file a report on June 28, 2018. A detective took her to the hospital, where staff documented cuts and bruises on Clara's arms, legs, and hip, and completed a sexual assault kit.

B.

Martin's Testimony

Martin testified that his sexual encounter with Clara was entirely consensual. He stated that when he arrived home with Sylvia and Clara, he went to lay down on his bed. He said that he got up when he heard a "commotion" near the entrance to his house and went outside to find Sylvia and Clara "dancing and having a good time." Martin testified that he went to "see if everything was all right" and told Sylvia to go to bed.

Martin testified that after he went back to his bedroom to sleep, Clara came in and asked for a blanket. Martin said that he gave her one off his bed and Clara took it to a couch in another room. According to Martin, after "laying there and then thinking it was really cold," he went to look for his

7

blanket and laid down on the couch with Clara. Then, Martin explained, "things started getting like a little hot and heavy," with them "mutually kissing." Martin said that Clara looked at him and asked if he had any condoms, to which he responded "[a]re you sure you still want to do this?" Clara replied, "Yes. But we have to go out to the garage because [Sylvia] already thinks I'm a whore."

Next, Martin remembered they went to the garage and Clara took her pants off. He stated that he "performed oral" sex on Clara, after which Clara "got down on her hands and knees and [Martin] went to penetrate." Martin testified that Clara then performed oral sex on Martin, crawling across the concrete floor on her hands and knees. Afterwards, they went to their respective bedrooms; Martin denied going to look at Clara in her room. According to Martin, Clara never indicated that she wanted to stop their sexual activities and he viewed the encounter as a "one-night stand." However, he acknowledged that Clara was intoxicated.

Martin stated that he cooperated with the police and to his knowledge, he was never charged with a crime. A detective later came to speak with him and collected Clara's underwear, which Martin retrieved from his bed. Martin claimed he had "no idea" how the underwear ended up there. Martin did not contact or communicate with Clara after the incident.

8

C.

On July 2, 2018, Clara filed for a temporary protective order against Martin pursuant to SASPA, N.J.S.A. 2C:14-13 to -21.  After conducting a plenary hearing, the trial court granted a final order of protection and issued a written opinion on August 7, 2018.  The trial court judge recounted that Clara was tasked with proving the two SASPA elements by a preponderance of the evidence.  In analyzing the first SASPA prong -- whether there was an act of nonconsensual sexual contact -- the court reviewed the factual findings and found both parties' accounts to be "equally plausible."  The judge highlighted, however, that it was undisputed that Clara "was very intoxicated" at the time of the sexual encounter and that she "consumed at least 10 if not more alcoholic drinks during the course of the evening."

To determine whether the sexual contact was consensual, the court looked to N.J.S.A. 2C:14-2, the criminal statute for aggravated sexual assault, and noted that its standard for non-consent included a victim "whom the actor knew or should have known . . . had a mental disease or defect which rendered the victim temporarily . . . incapable of understanding the nature of his conduct, including, but not limited to, being incapable of providing consent."  Acknowledging that our case law is silent on the issue of whether extreme voluntary intoxication could render a person temporarily incapable of

9

understanding the nature of her conduct, the court looked to the New Jersey State Police's website, which construed N.J.S.A. 2C:14-2 to include voluntary intoxication.

Applying the preponderance of the evidence standard, the judge found it "more likely than not that [Clara] was too intoxicated to give consent," emphasizing the unusual choice for the parties to engage in sexual activities in the garage and noting that Clara would not have "subjected herself to these proceedings" if her actions were consensual. Thus, the court concluded that Clara's extreme voluntary intoxication rendered her "temporarily incapable of understanding the nature of her conduct" and that she had therefore been subjected to nonconsensual sexual contact within the meaning of SASPA's first prong.

Turning to the second SASPA prong -- whether there was a possibility of future risk to the safety or well-being of the alleged victim -- the judge noted the lack of evidence that Martin sought to contact Clara after their encounter. Nonetheless, recognizing that SASPA was intended to provide protection to victims of nonconsensual sexual contact, including people not in dating relationships, as well as the possibility that Martin "may now harbor a grudge against [Clara] which would probably not have occurred but for these

10

proceedings," the court concluded that "it is more likely than not that a final restraining order is appropriate."

### D.

Martin appealed, and the Appellate Division reversed and remanded for further findings on the first SASPA prong. C.R., 461 N.J. Super. at 344, 353. In evaluating whether the trial court judge properly found Clara to be incapable of consent, the Appellate Division examined the definition of "mentally incapacitated," as used in N.J.S.A. 2C:14-2(a)(7). Id. at 347-49. After finding that the plain language of the definition included both voluntary and involuntary intoxication, the court considered the level of intoxication required to support a finding that a victim could not consent. Id. at 349-51.

The court began by looking to the criminal intoxication defense "because that defense challenges the actor's ability to form the state of mind required by the offense charged." Id. at 350. The court noted that to establish such a defense, a defendant must demonstrate "such prostration of the faculties . . . as puts the accused in such a state [of being] incapable of forming" criminal intent. Ibid. (alteration and omission in original) (quoting State v. Cameron, 104 N.J. 42, 54 (1986)). The Appellate Division determined that the prostration of faculties standard is proper for a SASPA analysis because "[t]he Legislature's silence as to the degree of intoxication required in this context

11

strongly suggests an intention to adopt the familiar standard that has been utilized in criminal matters." Id. at 351 (footnote omitted). Emphasizing that the question in this case goes to the same inquiry -- "ascertaining the intoxicated person's ability to form a particular state of mind" -- the court found "no reason not to apply the 'prostration of faculties' standard." Id. at 350-51.

In applying that standard, the Appellate Division found that the trial court failed to make the proper factual findings to determine whether Clara was sufficiently intoxicated to be incapable of consent. Id. at 351-52. Specifically, the court pointed to the lack of factors considered in State v. Cameron, including "'the actor's conduct as perceived by others,' what the actor 'said' and how the actor 'said it,' . . . 'and the actor's ability to recall significant events.'" Id. at 352 (quoting Cameron, 104 N.J. at 56). Noting that "mere intoxication will not suffice," the court remanded for further findings to determine whether Clara could demonstrate by a preponderance of the evidence that her faculties were prostrated. Id. at 353.

We granted Clara's petition for certification. 241 N.J. 329 (2020). We also granted amicus curiae status to Legal Services of New Jersey (Legal Services), the Domestic Violence Clinic and Project at Rutgers School of Law

-- Camden (Rutgers), and the New Jersey Coalition Against Sexual Assault and Partners for Women and Justice.

II.

A.

Clara argues that the Appellate Division erred in applying the prostration of faculties standard of consent; rather, according to Clara, this Court's affirmative consent standard in M.T.S., 129 N.J. 422, is controlling in determining "nonconsensual" sexual contact under SASPA. She emphasizes that the criminal prostration of faculties standard is wholly inapplicable to SASPA because, unlike the Prevention of Domestic Violence Act (PDVA), SASPA does not reference the criminal code in its definitions of predicate offenses. She asserts that the Legislature instead intended for the affirmative consent standard to govern because the Legislature is presumed to be aware of M.T.S. and judicial construction of its statutes. According to Clara, such a standard is more consistent with SASPA's goal of protecting sexual assault victims because the victims' subjective state of mind is irrelevant and because the M.T.S. standard does not require that victims bear the burden of proof to show lack of consent.

Amicus Legal Services largely echoes Clara's arguments, asserting that the Appellate Division erred in deviating from the M.T.S. affirmative consent

13

standard. Legal Services emphasizes that the more restrictive criminal aggravated sexual assault standard for consent undermines SASPA's protection given that "[a]bout half of all sexual assault victims report that they were drinking alcohol at the time of the assault."

Amicus Rutgers supports Clara's position and outlines the history and policy behind SASPA to provide context for its broad civil protections for victims of sexual assault. Like Clara and Legal Services, Rutgers maintains that the prostration of faculties standard is inapplicable to SASPA because SASPA does not incorporate the criminal code and because application of that standard here would impermissibly shift the burden of proof to the victim and thus run counter to SASPA's goals.

Amici New Jersey Coalition Against Sexual Assault and Partners for Women and Justice similarly argue that the affirmative consent standard should apply to SASPA. They emphasize that the prostration of faculties standard is intended for defendants seeking to escape liability for wrongdoing, not for plaintiffs seeking protective orders to prevent future harm. Furthermore, according to amici, such a standard is difficult for sexual assault victims to meet because they often proceed pro se, do not have a right to counsel, and lack access to evidence available to criminal defendants that would be helpful in establishing prostration of faculties.

14

B.

Martin counters that the Appellate Division decision should stand because the prostration of faculties standard is not an inappropriate or an unduly burdensome standard for SASPA applicants. He contends that under a prostration of faculties analysis for voluntary intoxication, the trial court must identify how intoxicated the victim was, which does not shift the burden of proof to the victim. Martin does not dispute whether affirmative consent is a more appropriate standard for SASPA, but instead asserts that Clara did, in fact, give affirmative consent because the trial court could not find that Clara did not consent by a preponderance of the evidence. He insists that a victim's level of intoxication should be merely one factor for consideration in determining whether consent existed, which the Appellate Division appropriately weighed in its prostration of faculties analysis. Finally, Martin claims that if this Court finds sexual assault victims are unable to consent merely because they consume alcohol, such a view would be unduly paternalistic and misogynistic because it suggests women need someone else to decide their ability to consent for them.[2]

---

[2] The current sexual assault statute is gender neutral. See N.J.S.A. 2C:14-2.

15

III.

Our determination of the appropriate standard in assessing whether an alleged victim under SASPA was incapable of consent due to intoxication is a question of law, so our review is de novo. See T.L. v. Goldberg, 238 N.J. 218, 228 (2019). This Court, therefore, "owe[s] no deference to the legal conclusions reached by the trial court and Appellate Division." Kaye v. Rosefielde, 223 N.J. 218, 229 (2015) (quoting Borough of Harvey Cedars v. Karan, 214 N.J. 384, 401 (2013)).

Appellate courts will, however, defer to the trial court's factual findings because the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Appellate courts owe deference to the trial court's credibility determinations as well because it has "a better perspective than a reviewing court in evaluating the veracity of a witness." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

A.

SASPA authorizes an alleged victim of nonconsensual sexual contact "who is not eligible for a restraining order as a 'victim of domestic violence'" under the domestic violence statutes to seek a protective order in the Superior

Court.  N.J.S.A. 2C:14-14(a)(1); L. 2015, c. 147, § 2 (eff. May 7, 2016).

SASPA is located within the Criminal Code in Chapter 14, which governs

sexual offenses, but SASPA is not a penal statute.  Rather, SASPA offers relief

in the form of a civil protective order to alleged victims of nonconsensual

sexual contact.  N.J.S.A. 2C:14-14.

SASPA provides that

> [a]ny person alleging to be a victim of nonconsensual
> sexual contact, sexual penetration, or lewdness, or any
> attempt at such conduct, and who is not eligible for a
> restraining order as a "victim of domestic violence" as
> defined by the provisions of subsection d. of section 3
> of L. 1991, c. 261 ([N.J.S.A.] 2C:25-19), may, except
> as provided in subsection (b) of this section, file an
> application with the Superior Court pursuant to the
> Rules of Court alleging the commission of such conduct
> or attempted conduct and seeking a temporary
> protective order.
>
> [N.J.S.A. 2C:14-14(a)(1).]

Significantly, a person may apply for, and the court may issue, a

protective order under SASPA "regardless of whether criminal charges based

on the incident were filed and regardless of the disposition of any such

charges."  N.J.S.A. 2C:14-14(c)(1).  A Superior Court judge may grant a

temporary protective order and "any relief necessary to protect the safety and

well-being of an alleged victim."  N.J.S.A. 2C:14-15(a); see also id. at (e)(6).

17

A temporary protective order is "immediately appealable for a plenary hearing de novo not on the record." N.J.S.A. 2C:14-15(d).

Upon an application for a final protective order, the Superior Court must hold a hearing within ten days. N.J.S.A. 2C:14-16(a). At the hearing, the applicant must prove the allegations by a preponderance of the evidence. Ibid. SASPA provides that

> [t]he court shall consider but not be limited to the following factors:
>
> > (1) the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, against the alleged victim; and
> >
> > (2) the possibility of future risk to the safety or well-being of the alleged victim.
>
> [Ibid.]

Those two factors are commonly referred to as the two "prongs" of SASPA.

A court may issue a final protective order only "after a finding or an admission is made that the respondent committed an act of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, against the alleged victim." N.J.S.A. 2C:14-16(e). Pursuant to N.J.S.A. 2C:14-16(b), a court "shall not deny" a final protective order on the basis of

the applicant's or alleged victim's failure to report the incident to law enforcement; the alleged victim's or the respondent's alleged intoxication; whether the alleged victim did or did not leave the premises to avoid nonconsensual sexual contact, sexual penetration, or lewdness, or an attempt at such conduct; or the absence of signs of physical injury to the alleged victim.

A final protective order remains in effect until further order of the Superior Court, and either party may petition the court to dissolve or modify a final order. N.J.S.A. 2C:14-16(i).

## B.

Although nonconsensual sexual contact forms the basis of a SASPA claim, the statute does not define "consent" or establish guideposts for determining when the sexual activity at issue is nonconsensual. In 1992, however, this Court issued M.T.S., a landmark decision that established affirmative consent as the standard in sexual assault cases. See 129 N.J. 422. In M.T.S., the defendant, who was seventeen at the time, sexually penetrated a fifteen-year-old girl without her permission. Id. at 425, 428. The trial court found the defendant delinquent of second-degree sexual assault, but the Appellate Division reversed because there was no evidence that the defendant used any force beyond that necessary to accomplish penetration. Id. at 428-30.

On appeal, this Court conducted an extensive examination of the history of rape laws throughout the country, particularly the stigma that has

19

historically been attached to alleged victims.  Id. at 431-33.  The Court

detailed the history of mistrust of victim testimony and of "assuming that

women lie about their lack of consent for various reasons:  to blackmail men,

to explain the discovery of a consensual affair, or because of psychological

illness."  Id. at 433 (quoting Cynthia Ann Wicktom, Note, Focusing on the

Offender's Forceful Conduct:  A Proposal for the Redefinition of Rape Laws,

56 Geo. Wash. L. Rev. 399, 401 (1988)).  This Court explained how a showing

of resistance eventually became the standard in many jurisdictions for

determining consent, with courts assuming that "any woman who was forced

to have intercourse against her will necessarily would resist to the extent of her

ability."  Ibid.  Indeed, this Court concluded it was clear that "the law put the

rape victim on trial."  Id. at 434.

In an effort to eliminate the burden victims bore of showing non-

consent, the Court determined that the better standard was to look at whether

permission to engage in sexual activity was freely and affirmatively given.  Id.

at 444.  In reversing the Appellate Division, the M.T.S. Court held

> that any act of sexual penetration engaged in by the
> defendant without the affirmative and freely-given
> permission of the victim to the specific act of
> penetration constitutes the offense of sexual assault.
> Therefore, physical force in excess of that inherent in
> the act of sexual penetration is not required for such
> penetration to be unlawful.

[Ibid.]

The Court clarified that "permission may be inferred either from acts or statements reasonably viewed in light of the surrounding circumstances," and that "[p]ermission is demonstrated when the evidence, in whatever form, is sufficient to demonstrate that a reasonable person would have believed that the alleged victim had affirmatively and freely given authorization to the act." Id. at 444-45. Further,

> neither the alleged victim's subjective state of mind nor the reasonableness of the alleged victim's actions can be deemed relevant to the offense. The alleged victim may be questioned about what he or she did or said only to determine whether the defendant was reasonable in believing that affirmative permission had been freely given. To repeat, the law places no burden on the alleged victim to have expressed non-consent or to have denied permission, and no inquiry is made into what he or she thought or desired or why he or she did not resist or protest.
>
> [Id. at 448.]

In 2020, almost 30 years after the M.T.S. decision, the Legislature amended the criminal sexual assault statute for the specific purpose of reflecting the holding of M.T.S. See N.J.S.A. 2C:14-2. As noted in the Statement to the amendment,

> This bill replaces the term "physical force" in accordance with the New Jersey Supreme Court's holding in State in Interest of M.T.S., 129 N.J. 422 (1992), which holds that the only requirement for a

21

> conviction under the sexual assault statute is proof beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely-given permission of the victim.
>
> [S. Law & Pub. Safety Comm. Statement to A. 2767 (Sept. 27, 2018).]

The revision was intended to make the statute "consistent with current relevant case law" and "incorporat[e] [M.T.S.'s] holding into the statute" by clarifying that "the only requirement for a conviction under the sexual assault statute is proof beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely-given permission of the victim." Ibid. The Legislature further acknowledged that "since the M.T.S. decision, courts that consider sexual assault cases need to use both the statute and the court decision to determine the elements necessary for conviction." Ibid. The statute was amended so that all references to "physical force" were removed and replaced with references to the standard adopted in M.T.S. regarding the "victim's affirmative and freely-given permission." See L. 2019, c. 474.

So, although the Legislature in enacting SASPA in 2015 made no mention of how courts were to go about determining whether the sexual activity in question was nonconsensual, the Legislature was certainly aware of the M.T.S. holding and that courts had been applying the decision's

22

affirmative consent standard in cases involving alleged nonconsensual sexual activity in the decades since that case was decided.

C.

As noted above, the Appellate Division adopted the prostration of faculties standard for deciphering whether an alleged victim was too intoxicated to consent to sexual activity under SASPA. C.R., 461 N.J. Super. at 352-53.

We have long applied the "prostration of faculties" standard to establish whether a criminal defendant was too intoxicated to form the requisite mens rea for a charged offense. See, e.g., Cameron, 104 N.J. at 53-54 (noting that "the requirement of 'prostration of faculties' as the minimum requirement for an intoxication defense" is "firmly fixed in our case law"); State v. Treficanto, 106 N.J.L. 344, 352 (E. & A. 1929). When the Criminal Code was enacted in 1979, it reflected the notion that self-induced intoxication is not a defense unless it negates an element of the offense -- specifically, conduct that is purposeful or knowing. Cameron, 104 N.J. at 51, 58. That is still the law today. N.J.S.A. 2C:2-8(a), (b).

The Cameron Court stated that "[i]n order to satisfy the statutory condition that to qualify as a defense intoxication must negative an element of the offense, the intoxication must be of an extremely high level." 104 N.J. at

23

54. This Court has identified six factors that help determine whether a criminal defendant's voluntary intoxication rises to the level of "prostration of faculties," including the quantity of intoxicant consumed, the time period, and the actor's conduct as perceived by others, among other things. State v. Mauricio, 117 N.J. 402, 419 (1990) (quoting Cameron, 104 N.J. at 56). Overall, for a criminal defendant to invoke a prostration of faculties standard, it must be clear that the defendant "did not know what she was doing or that her faculties were so beclouded by the [alcohol] that she was incapable of engaging in purposeful conduct." Cameron, 104 N.J. at 57.

## IV.

In reviewing those principles and the history of sexual assault jurisprudence in New Jersey, we hold that the affirmative consent standard articulated in M.T.S. is the correct standard to be applied in determining whether sexual activity was nonconsensual under SASPA.

In its holding, the Appellate Division found no reason not to apply the prostration of faculties standard, under which an alleged victim would have to bear the high burden of establishing that she was too intoxicated to consent. C.R., 461 N.J. Super. at 350-51. We disagree.

Under our statutes and case law, the standard for consent applicable to an alleged victim and the standard for an intoxication defense applicable to an

24

accused criminal defendant are different. Given the history of sexual assault in the law, as painstakingly detailed in M.T.S., a holding that alleged victims of sexual assault seeking a protective order should be held to the same standard as criminal defendants seeking to assert a defense would, quite frankly, set our law back decades to a time when alleged victims were the ones essentially put on trial. Applying the prostration of faculties standard in determining whether sexual activity was consensual is simply inconsistent with the standard set forth in M.T.S.

The Appellate Division and the trial court's heavy reliance on the criminal sexual assault statute, N.J.S.A. 2C:14-2, is misplaced. SASPA does not reference or incorporate the criminal statute at all. The Appellate Division conducted an extensive analysis of the provisions of the sexual assault statute that criminalize penetration of a victim whom the perpetrator knew or should have known was "mentally incapacitated" in determining that the prostration of faculties was the appropriate standard. C.R., 461 N.J. Super. at 347-49. But although SASPA is contained within the same chapter of the Code, SASPA makes no reference to the criminal statute and never once uses the term "mentally incapacitated" to describe nonconsensual sexual conduct. It is unlikely that the Legislature intended to incorporate the language of the criminal statute into SASPA, given the fact that it made no attempt to do so in

25

drafting the plain language of the statute. And, as the recent revision to the sexual assault statute reveals, the Legislature was aware of the M.T.S. standard.

The language of N.J.S.A. 2C:14-16(b), further, is consistent with applying the standard set forth in M.T.S. In -16(b), the Legislature outlined several factors that courts were not permitted to use in denying relief under SASPA, including the alleged victim's or defendant's alleged intoxication. Indeed, with N.J.S.A. 2C:14-16(b), it appears that the Legislature certainly did not envision an alleged victim's intoxication to serve as a hurdle in seeking a protective order. The additional clauses in -16(b) -- which prohibit denying relief based on a victim remaining in the location where the unwanted contact occurred or the absence of signs of physical injury -- further support that interpretation. Like the proscription against considering intoxication, the prohibition of those additional outmoded considerations helps free the statute of the vestiges of a time when victims were presumed to lie about their lack of consent, were required to show that they had resisted to their utmost ability, and were required to "disclose the injury immediately, suffer signs of injury, and cry out for help" in order to be considered credible. See M.T.S., 129 N.J. at 433. The language in -16(b) undermines any notion that the Legislature

26

intended alleged victims of sexual assault to be put on trial with the prostration of faculties standard, just as criminal defendants.

In 2021, we cannot and should not go back in time to a period when it was the norm to shame, blame, and prosecute victims. The prostration of faculties standard is and has only ever been applied to alleged criminals seeking to evade culpability by showing that they could not have formed the requisite mens rea for the offense charged. That concept has no place in our jurisprudence as applied to alleged victims of sexual assault seeking a protective order. We therefore remand the matter to the trial court for reconsideration of the final restraining order and whether the sexual activity was consensual or nonconsensual utilizing the M.T.S. affirmative consent standard.

V.

Although the Appellate Division did not address the second prong of SASPA, we discuss it briefly because our remand encompasses a reconsideration of that prong as well. The second prong of SASPA requires the court to determine whether there is a "possibility of future risk to the safety or well-being of the alleged victim." N.J.S.A. 2C:14-16(a)(2). The trial court, after conducting a detailed analysis on prong one, quickly found that prong two was satisfied. The trial court first noted that there was "no evidence that

27

[defendant] sought to message or contact the plaintiff after their experience together" and that "it is doubtful that [defendant] thought of these events as anything more than as he testified a 'one night stand.'" The court then determined, however, that because plaintiff initiated the restraining order proceedings, defendant was "subjected to legal fees and may now harbor a grudge against the plaintiff which would probably not have occurred but for these proceedings," so the court found that a restraining order was appropriate.

It cannot be that simply filing for a protective order is sufficient to create "the possibility of future risk to the safety or well-being of the alleged victim" noted in prong two. If that were so, prong two would be met in <u>every</u> single SASPA case. That could not have been the Legislature's intention.

Here, the factual findings that the trial court put on the record appear to counter plaintiff's establishing prong two of SASPA, and the trial court relied on the simple fact that plaintiff had sought a restraining order to conclude that "it is more likely than not that a final restraining order is appropriate" in this case. We remand so that the trial court may expand upon its abbreviated discussion of prong two and make additional findings of fact that support a determination either that the prong has been satisfied, or not, in deciding whether to issue the final restraining order.

28

## VI.

The Appellate Division's decision is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.