# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1849-23

M.K.,[1]

    Plaintiff-Respondent,

v.

B.L.,

    Defendant-Appellant.

_____

          Submitted September 10, 2025 – Decided October 22, 2025

          Before Judges Gooden Brown and DeAlmeida.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No FV-11-0180-24.

          Douglas Herring, LLC, attorney for appellant (Douglas Herring, on the briefs).

          Hand & Toker Family Law, LLC, attorneys for respondent (Carolyn B. Hand, on the brief).

---

[1] We use initials to protect the parties' confidentiality pursuant to Rule 1:38-3(c)(12).

PER CURIAM

Defendant B.L. appeals from the February 16, 2024 final protective order (FPO),[2] entered against him in favor of plaintiff M.K. pursuant to the Sexual Assault Survivor Protection Act (SASPA), N.J.S.A. 2C:14-13 to -21 (2016).[3] The FPO stemmed from a February 18, 2023 sexual encounter that occurred in defendant's dorm room at Princeton University (Princeton) following a campus party. Having considered the record and applicable legal principles, we affirm.

I.

By way of background,

> SASPA, which was enacted in 2015, allows survivors of sexual assault who cannot seek restraining orders under the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35, to seek temporary and permanent civil protective orders. [C.R. v. M.T. (C.R. I), 248 N.J. 428, 441 (2021)]. Specifically, "[a]ny person alleging to be a victim of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct," who is not eligible for a restraining order as a "victim of domestic violence" under the

---

[2] The order was amended on March 7, 2024.

[3] As of January 1, 2024, SASPA has been renamed the Victim's Assistance and Survivor Protection Act (VASPA). Since the FPO at issue in this appeal was issued under SASPA's provisions, we refer to SASPA throughout the opinion, and all citations to N.J.S.A. 2C:14-13 to -21 are to the pre-amendment language. See L. 2023, c. 127; C.R. v. M.T. (C.R. II), 257 N.J. 126, 153 & n.1 (2024) (Fasciale, J., concurring). Further, "[g]iven that VASPA did not change any provision relevant to the issuance of an FPO," the analysis here applies equally to VASPA. C.R. II, 257 N.J. at 153 & n.1 (Fasciale, J., concurring).

A-1849-23

PDVA, may apply for a protective order under SASPA. N.J.S.A. 2C:14-14(a)(1), -16.

[C.R. II, 257 N.J. at 140 (second alteration in original).]

Under the statute, an FPO hearing shall be held within ten days of the filing of an application for a temporary protective order (TPO),[4] and the standard for proving the allegations "shall be a preponderance of the evidence."  Id. at 141 (citing N.J.S.A. 2C:14-16(a)).  Following the hearing, a court may issue an FPO only after finding:

> (1) the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct[] against the alleged victim; and
>
> (2) the possibility of future risk to the safety or well-being of the alleged victim.
>
> [N.J.S.A. 2C:14-16(a).]
>
> [C.R. II, 257 N.J. at 141-142 (emphasis omitted).]

These two findings are referred to as "factors."  Id. at 133 n.4.

Critically, a court may not deny an FPO

> due to the "alleged victim's failure to report the incident to law enforcement; the alleged victim's or the respondent's alleged intoxication; whether the alleged

---

[4]  "[A] SASPA TPO may be issued 'when necessary to protect the safety and well-being of an alleged victim[.]'"  C.R. II, 257 N.J. at 143 (quoting N.J.S.A. 2C:14-15(a)).

victim did or did not leave the premises to avoid [the] nonconsensual sexual contact . . . ; or the absence of signs of physical injury to the alleged victim." N.J.S.A. 2C:14-16(b).  And "evidence of the alleged victim's previous sexual conduct or manner of dress at the time of the incident shall not be admitted" in any FPO proceeding.  N.J.S.A. 2C:14-16(c).

[C.R. II, 257 N.J. at 142 (alterations in original).]

If an FPO is issued, it shall "(1) prohibit the respondent from having contact with the victim; and (2) prohibit the respondent from committing any future act of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, against the victim."  N.J.S.A. 2C:14-16(e).  The FPO may also "include additional relief barring the respondent from entering the victim's home, school, or work."  C.R. II, 257 N.J. at 144 (citing N.J.S.A. 2C:14-16(f)(1) to (5)).

Turning to the facts pertinent to this appeal, after plaintiff obtained a TPO, a two-day FPO hearing was conducted on September 18 and 29, 2023, during which plaintiff and Marty Krzywicki, a Princeton University Department of Public Safety detective, testified.  Defendant presented no witnesses.

Plaintiff testified that she and defendant were freshmen at Princeton during the 2023 spring semester.  The two were in a writing class together, but "hadn't spoken" and "didn't really know" each other.

On February 18, 2023, plaintiff and her friends planned to attend "a party at one of the eating clubs" at Princeton. Prior to leaving for the party, she had "three or four" "[a]lcoholic drinks" with her friends at their dorm room at about 9:00 p.m. Plaintiff described herself as "tipsy," but "[m]ore or less" having her "wits about [her] at that point." At around 11:00 p.m., they left for the party.

Upon arrival, plaintiff and her friends got separated. Plaintiff ran into defendant and another student from their writing seminar and the three "started talking." They had "some drinks" before the student left plaintiff and defendant alone together. Plaintiff and defendant continued talking and then "went to the dance floor." While they were dancing, they engaged in a consensual kiss.

While on the dance floor, plaintiff "started to feel very dizzy," like "the room was spinning around [her]." A friend of plaintiff's saw her and "sort of tried to ask [her] if [she] was okay," and plaintiff "guess[ed] [she] nodded" yes from a discussion she later had with that friend. Plaintiff told defendant she wanted to leave, so they left together. Plaintiff did not "remember agreeing to go[] back to [defendant's] dorm room," but she remembered walking there. She recalled "it being very cold outside" and "feeling really sick to [her] stomach."

When they arrived at defendant's dorm room, his roommate and a few students were inside. After defendant talked to them, they "all left to go into the common area in the hallway." Once alone, plaintiff and defendant sat side-by-

5

side on his bed with their legs hanging over the side. Defendant asked plaintiff if he could kiss her, and "[she] said yes." Plaintiff testified that "the details get a little bit fuzzy" at that point, but she remembered defendant kissing her on the lips and the neck. At one point, defendant got up and went over to his desk. Plaintiff did not know what he did at the time, but later saw a "bag of [condoms] that [she] hadn't remembered being [on the desk] when [she] got to the room."

Once he returned, defendant transitioned from sitting with plaintiff to laying with his "full body on top of [hers]" lengthwise on the bed. She "remember[ed] it being heavy." Plaintiff "was wearing a black dress," but the skirt of her dress got "hiked up onto [her] torso" so that her "groin area [was] exposed." She was wearing underwear and did not remember them sliding down or coming off, nor did she remember if defendant unzipped his pants or tried to unbutton his or her clothing. Defendant fondled plaintiff's breasts, nipples, buttocks, and inner thigh through her clothes while they kissed for about "five to ten minutes." Plaintiff testified that up to that point, the sexual activity was consensual.

Suddenly, plaintiff felt "a very vivid feeling of [defendant's] one hand around [her] neck." According to plaintiff, while kissing and fondling her, defendant proceeded to choke her with his hand. Plaintiff testified that when defendant squeezed her neck, it was "painful" and she "kind of froze." She felt

6 A-1849-23

like her eyes "were going to pop out of [her] head" and her "oxygen was being cut off." Plaintiff "was in shock" because defendant did not "ask if he could put his hands on [her] neck," nor did she ask him to do so. In fact, defendant said nothing while choking her. Given that plaintiff is 5'3" and weighed about 100 pounds, and defendant is a "lot taller" and "weigh[ed] more than [her]," she did not believe she could push him off. She also could not speak "because [her] neck was physically being compressed."

Plaintiff recalled defendant "seem[ing] sexually aroused during th[e] encounter" but could not remember if he had an erection. His "groin was touching [her] body," and although he "continued to kiss" and fondle her breasts, she "wasn't kissing him back." Plaintiff had heard of choking or strangling in conjunction with sexual activity. However, plaintiff did not find the choking sexually gratifying and insisted that once defendant placed his hand on her neck, she did not want defendant to continue kissing or fondling her and did not consent to any further sexual contact.

Plaintiff testified that things started "fading to black" and she "believe[d] [she] passed out or blacked out" from the choking because she "was there for longer than [she] had thought." Although she thought she was in defendant's dorm room for "maybe [fifteen] minutes," an application on her phone showed she was there "for a longer period of time, maybe [thirty] minutes or more."

A-1849-23

When plaintiff regained consciousness, defendant got off the bed. Plaintiff was "confused," "felt really sick," and "wanted to leave." Defendant said something like, "let's do this again sometime." Plaintiff "didn't know what to say," so she responded, "okay, sure." On cross-examination, plaintiff acknowledged putting defendant's contact information in her phone before leaving.

Within minutes of regaining consciousness, plaintiff left defendant's dorm room, passing defendant's roommate and the other students sitting in a lounge area. An unknown female student saw that plaintiff appeared intoxicated and escorted her back to her dorm room. When plaintiff reached her room, it was after midnight. Plaintiff fell asleep in her clothes and woke up early in the morning, feeling "achy all over." She also had "pain in [her] neck." Once she observed bruises on her neck in the mirror, she remembered the strangulation. Later that morning, plaintiff went to her friends' dorm room and told them what had happened. She then called her mother to inform her about the incident and sent her a photo of the bruising on her neck. The photo was admitted into evidence.

Initially, plaintiff was "very hesitant to do anything." But, at her mother's urging, she went to the campus medical center and reported the incident to the nurses, who took her vitals, measured the bruises on her neck, and referred her to a counselor. Plaintiff met with the counselor the following day. Because

8

A-1849-23

plaintiff's neck was now swollen and the pain had worsened, plaintiff went to Penn Medical Center (Penn) that afternoon at the counselor's suggestion. At Penn, plaintiff underwent a CT angiogram with contrast to test for vascular damage. The results were negative. Plaintiff believed that her final diagnosis at Penn was a "superficial injury" to the neck because she had no "internal injury."

Plaintiff also underwent a forensic examination by a Sexual Assault Nurse Examiner (SANE), who took a series of photographs. Two photographs showed petechial hemorrhaging in plaintiff's eyes, which plaintiff testified was consistent with strangulation. Three of the photographs showed "bruising and redness" on plaintiff's neck measuring about "four to five centimeters." During the SANE examination, plaintiff recounted the incident, explaining that the choking was nonconsensual. Although plaintiff denied passing out to the examiner, during her testimony at the FPO hearing, plaintiff clarified that she "hadn't remembered passing out" at the time of her report to the SANE.

Plaintiff testified that for the next "three or four days," she wore turtlenecks or scarves at school to cover the redness on her neck. She felt "[s]tressed," "sad," and "began to grow more upset about the incident" in the following days. Due to her "emotional distress" and inability to "concentrate on [her] classes," plaintiff went back home out of state for a week to be with her

A-1849-23

family. This resulted in her missing and dropping classes. When plaintiff returned to campus, she struggled emotionally without her parents' support.

At first, plaintiff did not report the incident to Princeton, pursue a restraining order, or file criminal charges against defendant. She explained that she "was a little in denial" and "very scared" of "what the repercussions" of reporting might be. Ultimately, plaintiff "realized that it was unfair for [her] to . . . deal with [it] on [her] own and not speak . . . up about it" given the "significant impact" the incident already had "on [her] life." As a result, she went to the Department of Public Safety and gave a statement to Detective Krzywicki.

Plaintiff had previously met Krzywicki at Penn when she initially reported the incident two days after the assault. Krzywicki testified that when he first met plaintiff at Penn, she was "distraught." Based on his investigation, he was "[100%]" confident that plaintiff was strangled without her consent.

Defendant was subsequently arrested and charged with second-degree aggravated assault. His case was still pending at the time of the FPO hearing. According to Krzywicki, who was qualified as an expert in "determin[ing] . . . criminal offenses," the aggravated assault charge was predicated on the strangulation. Krzywicki testified he did not find probable cause to charge defendant with sexual penetration, sexual contact, criminal lewdness, or an

A-1849-23

attempt to commit any of those offenses. He said that "the focus of [the] investigation" was the strangulation, but did not rule out that a non-consensual sexual encounter occurred. Krzywicki also clarified that nonconsensual fondling of the breasts, buttocks, or inner thigh combined with the use or threat of force would qualify as criminal sexual contact.

In addition to reporting the incident to law enforcement, plaintiff simultaneously pursued a Title IX action with Princeton because she "wanted to feel safe on campus" and "seeing [defendant] around campus was traumatizing." Plaintiff started having panic attacks when she spotted defendant, and, in one instance, "turned around, ran, and threw up." The Title IX action resulted in "a mutual no[-]contact order," which plaintiff found "very restricting" and "unfair." She sought "a skewed no[-]contact order" through the "alternative resolution" process that would allow her to be anywhere on campus, including defendant's dining hall and dorm building, but would preclude defendant from taking the same classes as her or from joining any of the clubs in which she was involved. However, a modification of the order required defendant's consent, which was not forthcoming. At the time of the FPO hearing, the Title IX investigation was still pending.

A-1849-23

Dissatisfied with the Title IX process, and "extremely" fearful that she would encounter defendant on Princeton's "very small campus,"[5] plaintiff filed a SASPA complaint upon returning from a study abroad program. She then filed an amended complaint on July 26, 2023, with a signed addendum expounding on her relationship with defendant, the assault, defendant's actions following the assault, and her resultant distress. The addendum was consistent with plaintiff's testimony at the FPO hearing. Plaintiff was granted a TPO on July 27, 2023, that, among other things, prohibited defendant "from attending [plaintiff's] classes," going to her residence, or "having <u>any</u> . . . form of contact or communication" with her.

Plaintiff testified she wanted a protective order because she feared retaliation and had heard that defendant had been "making false claims about the incident" and "disparaging [plaintiff] to fellow students." Plaintiff acknowledged, however, that defendant had never attempted to contact her directly, come to her dorm, or attend any of her classes after the issuance of Princeton's no-contact order. Although plaintiff was not afraid of defendant physically attacking her, she explained that she developed post-traumatic stress disorder (PTSD) after the incident and seeing defendant caused her emotional

---

[5] Plaintiff testified that "[i]n the first week" of the 2023 fall semester, she "ran into [defendant] four times."

distress. Plaintiff's symptoms included "anxiety," "loss of appetite, sleeplessness, vomiting, and night terrors." As a result, plaintiff sought additional counseling and was prescribed medication for her PTSD.

Plaintiff testified that as long as she and defendant both attended Princeton, she wanted "to be able to move freely anywhere . . . on campus" without fear of encountering him. Specifically, she wanted the court to restrict defendant from campus areas she frequented so that "most of the burden [was no longer] on [her]." Those areas included her and her friends' dorms, clubs she was involved with, and classes she attended.

Following the hearing, on February 15, 2024, the judge issued a ruling granting the FPO. In an oral opinion, the judge found that plaintiff proved by a preponderance of the evidence "non-consensual sexual contact" and the need for an FPO "to protect her safety or well-being." In assessing plaintiff's credibility, the judge noted plaintiff was open and engaged during questioning, made eye contact, and testified consistently and in accord with her SASPA complaint. Further, plaintiff's "facial expressions," "voice," and "demeanor at trial" showed "she was deeply affected" by the encounter "and was telling the truth."

The judge also pointed out that plaintiff's testimony was uncontroverted and supported by documentary evidence, and that the cross-examination failed to undermine her credibility. Critically, the judge discounted as irrelevant under

13

the law defense counsel's varied attempts to discredit plaintiff by highlighting plaintiff's delayed reporting to police, level of intoxication, or failure to struggle during the assault. Accordingly, the judge made detailed factual findings consistent with plaintiff's testimony.

Applying the governing legal principles, the judge first found there was jurisdiction under SASPA because there was no evidence that the parties had "a qualifying relationship" under the PDVA. Next, citing the statute's definition of sexual contact and intimate parts, the judge found that a non-consensual sexual contact had taken place. The judge explained:

> [Defendant] was touching [plaintiff's] intimate parts, vagina and breasts through his or her clothing[.] [W]ithout warning, he began to choke . . . plaintiff.
>
> Without asking her, he then continued to kiss . . . plaintiff and, more importantly, continued to lay on top of her while he was choking her, . . . with his intimate parts continuing to touch hers through her clothing.
>
> Plaintiff could not breathe or speak once . . . defendant started to choke her, but she stopped kissing him back. She then blacked out and woke up with him getting off of her.

Since "SASPA does not define the term consent," the judge relied upon principles announced in State in Interest of M.T.S., 129 N.J. 422, 444-45, 448 (1992), and C.R. I, 248 N.J. at 442-43, defining consent in the context of sexual penetration. The judge found "no evidence in the record indicating . . . defendant

verbally, or in a nonverbal manner, asked . . . plaintiff for consent to choke her while engaging in sexual contact" and found no evidence plaintiff "in any way affirmatively consent[ed] . . . to engage in sexual contact after he began choking her."

The judge added:

> There is just simply no evidence in the record to conclude defendant had a reasonable belief that . . . plaintiff gave him some sort of affirmative permission to not only choke her . . . , but to continue . . . while he [was] choking her, to engage in sexual contact.

The judge noted that defendant "clearly understood his obligation to obtain affirmative consent from plaintiff" as evidenced by the fact that he asked plaintiff if he could kiss her "at the outset of the encounter." However, according to the judge, "[a]ll of the testimony in evidence indicate[d] . . . defendant did not ask . . . plaintiff, either through his body language or verbally, for her permission to choke her during a sexual encounter and continue[d] to choke her while he continued to sexually gratify himself."

Thus, the judge concluded the acts proven fell "squarely within the scope of non-consensual sexual contact" under SASPA's definition, explaining:

> Under these circumstances, sexual contact . . . under the definition of SASPA[] took place during the entirety of the encounter.

15

> The sexual contact that was consensual stopped being consensual once he put his hands around her neck, continued to kiss her, continued to lay on top of her until she blacked out[,] and she woke up with him getting off of her.

Turning to the second factor, the judge stated that under the statute, an FPO may be issued where a plaintiff proves by a preponderance of the evidence that there is a "possib[ility of] future risk to the safety or well-being of the alleged victim," (quoting N.J.S.A. 2C:14-16(a)(2)). Since "there [was] no published guideline for determining whether plaintiff . . . satisfied this requirement," the judge "interpret[ed] these terms according to their [ordinary] meaning" under Webster's Dictionary and "[i]n the context of . . . [SASPA], which was . . . intended to protect victims of sexual assault . . . who do not qualify under the PDVA." Accordingly, the judge determined that "risk" included "the possibility of loss or injury," "safety" encompassed "the condition of being safe from undergoing or causing hurt, injury, or loss," and "well-being mean[t] the state of being happy, healthy, and prosperous."

Applying those definitions to the statutory language, the judge concluded there was "uncontroverted testimony[ that] support[ed] the entry of the [FPO] to protect plaintiff's safety and well-being." The judge expounded:

> [A]s a result of this incident . . . , plaintiff . . . continues to suffer great psychological impact, including panic attacks, PTSD, anxiety, loss of sleep, increased

16

treatment in therapy, [and] the need to take additional medications.

> She had to leave school[ and] go home for a week after what happened to obtain support from her family.

> She[] had to drop classes.  When she has seen . . . defendant on campus[,] . . . she has had to run away, throw up, [and] suffer[] crying jags and panic attacks, including in this courtroom.

> Princeton['s] campus is a small campus.  Plaintiff has seen and been in the same location as defendant on a number of occasions, causing her great distress.

The judge further explained that the other protective orders were insufficient to safeguard plaintiff:

> The Princeton no-contact order is insufficient to address her safety and well-being . . . [.  I]t essentially requires both parties to avoid each other, their respective dining halls and dorm rooms[,] and to refrain from contact.

> . . . .

> And it has failed to make . . . plaintiff feel safe or foster her well-being and will likely continue to fail to adequately address her distress because . . . [Princeton] cannot issue an order that will impact . . . defendant's education.

> Plaintiff can derive no comfort from the criminal no-contact order, which only bars contact between the parties and may, or may not, remain in place, depending on the trajectory of the criminal matter, which is currently pending against . . . defendant.

A-1849-23

In contrast, the judge noted that the Legislature drafted SASPA "in a manner that it can bar defendants entirely from school, among other locations."

After engaging in extensive discussions with both counsel about the content of the order, the judge issued a "temporary" FPO on February 16, 2024, directing in pertinent part that:

> [D]efendant may only eat at the dining hall attached to his dormitory and is barred from any other buildings on campus except for his dormitory, dining hall[,] and . . . classrooms. Furthermore, defendant may only attend functions or activities on campus in other locations[] if related to academics. He is further barred from the [e]ating [c]lubs, and ordered to explore off-campus or graduate housing with kitchen facilities where he may change his residence for the remaining dates during the [s]pring semester. Defense counsel shall provide plaintiff's counsel with a schedule and location of defendant's classes and academic activities. Counsel for the parties shall also meet and confer regarding viable restraints that will remain in place from [s]pring semester 2024 and through to the end of the school year in 2025, and thereafter. A case management conference will be scheduled within the next [two] weeks so that the court can enter final restraints in this matter.

On March 7, 2024, the judge issued an amended FPO, which included a seven-page addendum detailing additional restraints. The order barred defendant from: all eating clubs on or off campus; all Princeton "sporting and exercise facilities, gyms, pools, stadiums, fields or locations"; plaintiff's place of employment; and plaintiff's on-campus or off-campus housing and dining

18

hall. Defendant was ordered to "reside off campus" at the end of the 2024 spring semester "for the remaining time that he attends" Princeton. He was only permitted to remain in his on-campus housing if "the parties determine[d] that alternative off-campus or graduate housing with a kitchen [was] not offered, available[,] or allowed by [Princeton]." Further, he was barred from "attend[ing] the same classes" or "participat[ing] in the same organized activities/groups" as plaintiff.

Under the order, when "on campus or within a [one-]block radius of campus," defendant had to "leave the vicinity as soon as [he] observe[d] or otherwise determine[d] he and . . . plaintiff [were] in the same location," unless he was attending class, or was in or participating in one of the "permitted locations/activities." The order denoted the permitted locations and activities for the 2024 spring semester, which included defendant's classes, office hours for professors and teaching assistants, libraries, the student center, academic-related student activities, and several buildings deemed "necessary," such as the health center, places of worship, and the financial aid office. Several of the locations were restricted to certain times.

Pursuant to the order, to enable plaintiff to "prospectively avoid" defendant, defense counsel was directed to provide plaintiff's counsel with a list of "defendant's classes, the names of his professors and teaching assistants . . . ,

and meeting times and locations of his professional organizations, clubs and the like." The parties were also ordered to exchange information through counsel at least two weeks before the start of each semester and to update the court so that the FPO could be amended. If the parties sought to amend the permitted locations or activities, the order directed them to "confer through counsel, advise the court if they agree to an amendment . . . , and[,] if not, . . . participate in a case management conference before bringing a motion."

On August 28, 2024, the judge filed an amplification of reasons for her prior ruling as permitted by Rule 2:5-1(d) to, among other things, account for our Supreme Court's decision in C.R. II, which was issued about one month after the amended FPO was entered. The judge reasoned that C.R. II further supported her findings under the second factor and her decision to grant the FPO. Specifically, because the Legislature "draft[ed] divergent provisions in SASPA as compared to the PDVA," the judge found that "SASPA create[d] a more permissive and easily satisfied standard for the issuance of FPOs."

In support, the judge pointed out that both plaintiff and the C.R. II plaintiff had "strikingly similar" testimony in that "they could not sleep, were caused to obtain mental health services[,] and suffered deep trauma" as a result of "the predicate act involving non-consensual sexual contact." Finally, the judge reasoned that C.R. II supported her decision to "include tailored restraints that

20

exclude or otherwise limit [d]efendant's access to certain buildings and locations" on Princeton's campus. Citing N.J.S.A. 2C:14-16(f), the judge explained that the statute allowed courts "to equitably construct school-based restraints, as was carefully crafted here to protect . . . [p]laintiff's safety and well-being." This appeal followed.

II.

Our standard of review is well settled. We owe substantial deference to the Family Part's factual findings because of the court's special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). "'That deference is especially appropriate "when the evidence is largely testimonial and involves questions of credibility."'" C.R. II, 257 N.J. at 139 (quoting MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007)).

Although we owe no deference to the trial court's legal conclusions, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we will not interfere with "'the factual findings and legal conclusions of the trial [court] unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice,'" or we "determine the [trial] court has palpably abused its discretion," Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (omission in original) (second alteration in original) (quoting Cesare, 154 N.J.

at 412).  Stated differently, "[w]e reverse only to 'ensure that there is not a denial of justice' because the family court's 'conclusions are [] "clearly mistaken" or "wide of the mark."'"  Id. at 48 (second alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

"As a general rule, courts exercising their equitable powers are charged with formulating fair and practical remedies appropriate to the specific dispute." Kaye v. Rosefielde, 223 N.J. 218, 231 (2015).  Appellate courts review a Family Part judge's adoption of an equitable remedy for abuse of discretion.  Ibid.; see also Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (noting appellate courts "accord great deference to discretionary decisions of Family Part judges").  "'[J]udicial discretion connotes conscientious judgment, not arbitrary action; it takes into account the law and the particular circumstances of the case before the court.'"  Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007) (quoting Higgins v. Polk, 14 N.J. 490, 493 (1954)).  Thus, an abuse of discretion only "'arises when a decision [was] "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'"  Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

22

Guided by these principles, we discern no basis to overturn the judge's decision to issue an FPO in this case. Defendant argues the judge "erred in finding nonconsensual sexual contact" occurred. He contends the judge "creat[ed] a new definition of sexual contact by criminalizing" a "consensual embrace." He asserts Krzywicki's expert testimony "that there was no sexual contact in the facts of this case" convincingly disproves the judge's "novel interpretation that criminal sexual contact [can] occur by . . . a clothed torso touching another clothed torso while kissing."

As the judge stated, "[s]exual contact" is defined as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts, for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." N.J.S.A. 2C:14-14(a)(1). "'Intimate parts' means the following body parts: sexual organs, genital area, anal area, inner thigh, groin, buttock[,] or breast of a person." Ibid.

Here, there was sufficient evidence for the judge to find that non-consensual sexual contact within the meaning of N.J.S.A. 2C:14-14(a)(1) occurred "during the entirety of the encounter." Plaintiff's unopposed testimony established that prior to the choking, through her clothing, defendant fondled her breasts, nipples, buttocks, and inner thigh, all of which constitute "intimate parts." N.J.S.A. 2C:14-14(a)(1). While choking her, defendant's "groin was

touching [her] body," he continued to fondle her breast, and he "seem[ed] sexually aroused during th[e] encounter." Although the initial sexual activity was consensual, plaintiff was adamant that once the choking began, she no longer consented to the sexual encounter. Because the fondling continued during the choking, with defendant intentionally touching plaintiff's intimate parts while choking her for sexual gratification, a predicate act of sexual contact occurred.

Defendant's characterization of the contact as a "consensual embrace" distorts plaintiff's testimony. Likewise, defendant misrepresents the totality of Krzywicki's testimony as Krzywicki stated the fact that defendant was not being charged with criminal sexual contact did not "mean that a non-consensual sexual encounter did not occur." In fact, Krzywicki testified that nonconsensual fondling of the breasts, buttocks, or inner thigh combined with the use or threat of force would qualify as criminal sexual contact. Therefore, based on Krzywicki's testimony, choking plaintiff while fondling her intimate parts without her consent as occurred here sufficed to establish criminal sexual contact.

Defendant claims plaintiff "affirmatively and freely" gave "authorization to all sexual contact" and "was aware that choking can be a sexual foreplay practice." He further argues that plaintiff "secretly withdrew consent," as she

24

"made no verbal or physical indication that she was not consenting to having her throat held."  Defendant points to plaintiff's failure to struggle during the assault or say anything to him afterward to support his claim.

The standard for determining whether sexual activity is consensual is "affirmative consent," that is, if the alleged victim gives permission "freely and affirmatively."  C.R. I, 248 N.J. at 443.  Our Supreme Court established this objective standard in M.T.S. "[i]n an effort to eliminate the burden victims [once] bore of showing non-consent."  C.R. I, 248 N.J. at 443 (citing M.T.S., 129 N.J. at 444).  Though permission may be given affirmatively, it may also "be inferred either from acts or statements reasonably viewed in light of the surrounding circumstances," and it "is demonstrated when the evidence, in whatever form, is sufficient to demonstrate that a reasonable person would have believed that the alleged victim had affirmatively and freely given authorization to the act."  M.T.S., 129 N.J. at 444-45.

Additionally,

> neither the alleged victim's subjective state of mind nor the reasonableness of the alleged victim's actions can be deemed relevant to the offense.  The alleged victim may be questioned about what he or she did or said only to determine whether the defendant was reasonable in believing that affirmative permission had been freely given.  To repeat, the law places no burden on the alleged victim to have expressed non-consent or to have denied permission, and no inquiry is made into what he

25

or she thought or desired or why he or she did not resist or protest.

[C.R. I, 248 N.J. at 443 (quoting M.T.S., 129 N.J. at 448).]

In C.R. I, the Court noted that "[i]n 2020, almost [thirty] years after the M.T.S. decision, the Legislature amended the criminal sexual assault statute for the specific purpose of reflecting the holding of M.T.S." C.R. I, 248 N.J. at 443 (citing N.J.S.A. 2C:14-2). The Court pointed out that the Legislature was thus "certainly aware" of the "affirmative consent standard articulated in M.T.S." when it enacted SASPA in 2015, and, therefore, it was "the correct standard to be applied in determining whether sexual activity was nonconsensual under SASPA." C.R. I, 248 N.J. at 444-45.

Here, the judge's determination that the sexual contact was nonconsensual is adequately supported by the record. At the outset, defendant received verbal permission to kiss plaintiff and plaintiff confirmed that the initial sexual activity was consensual. However, as the judge stated, no evidence showed that plaintiff "in any way affirmatively consent[ed]" to being choked. Despite demonstrating he was aware he could ask for consent, defendant choked plaintiff without seeking permission and without her asking him to do so.

Defendant's contention that plaintiff consented to "all sexual contact" is belied by plaintiff's testimony. It also offends common sense. See Murphy v.

Implicito, 392 N.J. Super. 245, 261 (App. Div. 2007) ("[I]f the actor exceeds the consent, [the consent] is not effective for the excess." (quoting Restatement (Second) of Torts § 892A (A.L.I. 1979))); Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2(c)(1))" (rev. Jan. 24, 2005) ("You must decide whether the defendant's [sexual] act . . . was undertaken in circumstances that led the defendant to reasonably believe that the victim had freely given affirmative permission to the specific [sexual] act . . . ." (emphasis added)). Moreover, plaintiff's subjective knowledge of choking being a "sexual foreplay practice" is irrelevant under the law. See C.R. I, 248 N.J. at 443.

Defendant's argument that plaintiff "secretly withdrew consent" runs afoul of the Court's declaration in C.R. I that "the law places no burden on the alleged victim to have expressed non-consent." Id. at 443 (quoting M.T.S., 129 N.J. at 448). It also overlooks plaintiff's testimony that defendant precluded her from speaking because her "neck was [being] physically . . . compressed." As the judge found, there is "simply no evidence in the record to conclude defendant had a reasonable belief" from the circumstances that plaintiff consented to the choking.

Equally unavailing is defendant's argument that plaintiff's failure to struggle indicated consent. Plaintiff, who was much smaller than defendant, testified she did not believe she could push him off of her. Regardless, "no

inquiry" should be made into what a victim thought "or why he or she did not resist or protest." C.R. I, 248 N.J. at 443 (quoting M.T.S., 129 N.J. at 448). Indeed, SASPA is intended to avoid putting the victim on trial, see N.J.S.A. 2C:14-16(b), and defendants are no longer able to blame the victim as a defense. C.R. I, 248 N.J. at 447 ("[W]e cannot and should not go back in time to a period when it was the norm to shame, blame, and prosecute victims.").

Defendant also challenges the judge's finding of the second factor, arguing that plaintiff's testimony did not meet the requisite standard but only established that "seeing . . . defendant around campus may cause her emotional upset." In support, defendant points to plaintiff's testimony that she was "not in fear for her safety," "has not been contacted by [defendant]," and "only wants [the FPO] to not see . . . [him]." Defendant also notes that plaintiff "did not seek a [protective] order for five months and allowed . . . [Princeton's] no[-]contact order to expire."

In C.R. II, our Supreme Court interpreted N.J.S.A. 2C:14-16(a)(2), which requires a court to consider "the possibility of future risk to the safety or well-being of the alleged victim." C.R. II, 257 N.J. at 145. The Court noted that "[b]ecause SASPA does not define the words 'possibility,' 'risk,' 'safety,' or 'well-being,'" these terms must be given their "'generally accepted meaning, according to the approved usage of the language.'" Id. at 145 (first quoting N.J.S.A. 2C:14-

16(a)(2); and then quoting N.J.S.A. 1:1-1). Consequently, like the judge here, the Court turned to dictionary definitions to discern the meaning of subsection (a)(2) as follows:

> The New Oxford American Dictionary defines "possibility" as "a thing that may happen or be the case." New Oxford American Dictionary 1365 (3d ed. 2010). The word "possibility" therefore does not require that something will definitely happen, will probably happen, or even will likely happen; it simply requires a chance that something "may happen or be the case." "Risk" is defined as "a situation involving exposure to danger" or "the possibility that something unpleasant or unwelcome will happen." Id. at 1507. "Safety" is "the condition of being protected from or unlikely to cause danger, risk, or injury." Id. at 1537. And "well-being" is a "state of being comfortable, healthy, or happy." Id. at 1961.
>
> [C.R. II, 257 N.J. at 145-146.]

Applying these definitions to the statutory language, the Court determined that the Legislature purposely created "a lenient and easy-to-satisfy standard" compared to the PDVA. Id. at 146. The Court explained:

> The plain language of factor two thus requires a court to consider whether there is a chance that a survivor may be exposed to physical danger, risk, or injury, or may be exposed to something emotionally unwelcome or unpleasant that could make them feel uncomfortable, unhealthy, or unhappy. And because the language of factor two is centered on the safety or well-being of the victim-survivor, a survivor's own testimony regarding possible future risks to their safety or emotional well-being can suffice.

A-1849-23

[Ibid.]

C.R. I and C.R. II involved a defendant who engaged in sexual activities with the victim, a friend of defendant's cousin, in his home garage. C.R. I, 248 N.J. at 432-35. The trial judge granted an FPO, finding that the victim's "extreme voluntary intoxication" rendered the sexual encounter nonconsensual "within the meaning of SASPA's first [factor]." Id. at 436. Turning to the second factor, despite "the lack of evidence that [the defendant] sought to contact [the victim] after their encounter[,]" the judge found the second factor was satisfied because the defendant "may now harbor a grudge against [the victim]" for instituting the court proceedings. Ibid.

The C.R. I Court remanded the case for the trial court to make additional findings of fact as to the second factor because the trial court had "relied on the simple fact that [the] plaintiff had sought a restraining order to conclude that 'it is more likely than not that a final restraining order is appropriate' in th[e] case." Id. at 448. On remand, the victim testified before a different judge that she continued to be intensely affected by the assault over three years later. C.R. II, 257 N.J. at 135. Specifically, she stated she was "traumatized," would "lay in bed at night and . . . [not] sleep," had "terrible intimacy issues[,]" and had "seen multiple therapists." Ibid. When asked if she feared for her safety, she testified she believed the defendant "would definitely harass [her]" for continuing the

case and that "the only reason [she had] any . . . peace of mind" was because of the protective order.  Ibid.

The trial court found the victim's testimony "credible and believable." Ibid.  The court acknowledged that the defendant "had not attempted to contact [the victim]" since the incident but "found that did 'not foreclose the possibility of risk to [the victim's] safety or her well-being.'"  Id. at 136.  Accordingly, the court found "a significant risk to [the victim's] psychological well-being" to satisfy SASPA's second factor.  Ibid.

The defendant appealed, claiming that he posed "no threat" to the victim and her fear of him was "irrational."  Ibid.  Deferring to the trial court's factual findings, our Supreme Court concluded that the plaintiff's "credible testimony about such emotional and psychological harm can be sufficient to satisfy SASPA's second factor" and justified maintaining the FPO.  Id. at 148.  The Court added that "nothing in the plain language of N.J.S.A. 2C:14-16(a)(2) requires a survivor's belief about the possibility of future risk to their safety or well-being to be objectively reasonable."  Id. at 149.

Here, as the judge noted, both plaintiffs offered "strikingly similar" testimony, including that they could not sleep, required mental health services, and suffered deep trauma.  Plaintiff also confirmed a PTSD diagnosis and testified she suffered increased anxiety, loss of appetite, vomiting, and night

terrors as a result of the encounter. She believed the FPO was necessary to relieve her of the negative physical and emotional responses arising from seeing defendant on campus. Additionally, she feared retaliation, given defendant's comments to other students about the incident. Plaintiff's credible testimony about her emotional and psychological harm easily satisfies SASPA's second factor, just as in C.R. II. 257 N.J. at 147-49. We therefore reject defendant's challenge to the judge's findings in that regard.[6]

Lastly, defendant argues that the judge abused her discretion in crafting the terms of the amended FPO. He contends there is no rational explanation for him being barred from parts of campus, such as a men's locker room or an off-campus eating club, "without regard to . . . plaintiff's presence in those locations." He also asserts that the judge's continuing requirement for the parties to meet and confer through counsel prior to the start of each semester "'departed from established policies' of trying to prevent contact between" victims and defendants. As a result, he posits the requirement "is not rationally related to the purpose of the . . . order."

---

[6] As to defendant's attempt to discredit plaintiff because she did not seek to renew Princeton's no-contact order, plaintiff explained that she chose not to renew the order because it did not "have any value to her," it "severely restricted [her] movement," "heavily impacted [her] and [her] social life at school," and did not make her "feel protected."

Family Part judges have "broad discretionary power to adapt equitable remedies to the particular circumstances of a given case." Kaye, 223 N.J. at 231 (quoting U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 476 (2012)). Restraining orders are considered forms of equitable relief. See L.C. v. Bd. of Rev., Dept. of Labor, 439 N.J. Super. 581, 586 (App. Div. 2015). Just like the PDVA, SASPA is remedial in nature. See N.G. v. J.P., 426 N.J. Super. 398, 409 (App. Div. 2012) (citing Cesare, 154 N.J. at 400) ("The [PDVA] is remedial in nature."); C.R. II, 257 N.J. at 165 (Fasciale, J., concurring) (noting that SASPA was enacted to provide enhanced protection and better respond to victims of sexual assault).

Accordingly, like the PDVA, SASPA's provisions "should be construed liberally, giving their terms the most expansive reading of which they are reasonably susceptible." N.G., 426 N.J. Super. at 409. This approach is compelled by "New Jersey's public policy to protect victims of sexual violence." C.R. II, 257 N.J. at 166-67 (Fasciale, J., concurring) (collecting academic research that "supports the need to provide accessible legal remedies in the form of protective orders for victims" of sexual assault); cf. State v. Ramirez, 252 N.J. 277, 299 (2022) (noting that many statutes reflect New Jersey's "forceful public policies . . . to safeguard [sexual assault] victims from physical and emotional harm").

Commensurate with New Jersey's clear public policy, in addition to prohibiting contact with the victim, see N.J.S.A. 2C:14-16(e), SASPA authorizes other relief upon the issuance of an FPO. Specifically, N.J.S.A. 2C:14-16(f) provides in pertinent part:

> In addition to any relief provided to the victim under subsection [(e)] of this section, a final protective order issued pursuant to this section may include, but is not limited to, the following relief:
>
> > (1) an order prohibiting the respondent from entering the residence, property, school, or place of employment of the victim . . . and requiring the respondent to stay away from any specified place that is named in the order and is frequented regularly by the victim . . . ; [and]
> >
> > . . . .
> >
> > (5) any other relief that the court deems appropriate.

All forms of relief under subsection (f) can "be applied in any FPO." C.R. II, 257 N.J. at 151 (emphasis added).

Here, the terms of the amended FPO were clearly authorized by SASPA and we discern no abuse of discretion in the judge's decision to fashion the terms to afford plaintiff the maximum protection permitted under the law. N.J.S.A. 2C:14-16(f) specifically allows the court to bar defendant from the victim's school and to issue "any other relief that the court deems appropriate." Ibid.

A-1849-23

This catchall provision is broad in scope and clearly encompasses the location, activity, and time-based restraints issued here to minimize the contact between the parties while they are attending school together, as opposed to a complete ban which is also permissible.

Given plaintiff's history of running into defendant at various locations on Princeton's "very small campus," including at social events, eating clubs, and other common areas, the terms of the FPO were not "made without a rational explanation" as defendant claims. Instead, the terms effectively prevent defendant from engaging in or being on campus for any activity that is not academic-related. Though strict, the judge astutely determined that the FPO's tailored terms were the best way to minimize the parties' contact without infringing upon defendant's right to continue his education at Princeton.

We reject defendant's contention that the FPO encourages contact between the parties. The order does not require the parties to contact one another, but rather communicate "through counsel" to exchange information and update the order each semester as needed. Such conditions are commonplace in protective orders and serve the interests of both parties by allowing any necessary revisions based on academic schedules and the like.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division